# UNITED STATES *v.* REILY.

No. 31. Argued October 18, 19, 1933.—Decided November 6, 1933.

**34**

*Assistant Attorney General Sweeney,* with whom *Solicitor General Biggs* and *Mr. Pedro Capó-Rodríguez* were on the brief, for the United States.

*Mr. F. H. Reily,* with whom *Mr. Mark Goode* was on the brief, for respondent.

Mr. Justice Van Devanter delivered the opinion of the Court.

This suit was brought by the United States to enforce its rights and regulations in respect of allotted Indian land held under a so-called trust patent. The land was allotted, and the trust patent issued, with the express restriction that the land should be inalienable for a designated period, which the President might extend, and that any alienation contrary to the restriction should be absolutely void.[1] After the allottee's death and during the period of restriction, as extended by the President, the heir conveyed part of the land to the defendant.

The defendant prevailed in both courts below, 62 F. (2d) 621, and the United States petitioned for certiorari, which this court granted.

It is settled, and is conceded, that a restriction on alienation such as is here shown is not personal to the allottee but runs with the land and operates upon the heir the same as upon the allottee.[2] So it is apparent the heir's conveyance was void, unless in some way the restriction was removed before the conveyance was made.

The real question is whether the restriction was removed by Congress by the Act of June 21, 1906,[3] which will be set forth later on.

The material findings of the District Court stand unchallenged and are to the following effect: The allottee, a

---

[1] Acts Feb. 8, 1887, c. 119, § 5, 24 Stat. 388; March 3, 1893, c. 203, Art. IV, 27 Stat. 557.

[2] *Bowling* v. *United States,* 233 U.S. 528, 535; *United States* v. *Noble,* 237 U.S. 74, 80.

[3] C. 3504, 34 Stat. 325, 363.

Kickapoo Indian woman, and her infant son were members of the Kickapoo tribe of Oklahoma whose lands were allotted in severalty among its members in 1894. Both were then living with the tribe in Oklahoma and each received an allotment from the tribal lands. In 1903 the mother, taking the son with her, moved into the Republic of Mexico and established a residence in a Mexican community or tribe of Kickapoos to be described later on. She continuously maintained that residence and affiliated with that tribe until 1929, when she died intestate, leaving the son as her only heir. The son resided in Mexico until 1920 and then gave up that residence and returned to the Kickapoo Reservation in Oklahoma. Continuously thereafter he made the latter place his residence and home. He was residing there in 1929 when his mother died, in 1930 when he made the conveyance to the defendant, and in 1931 when this suit was begun.

In turning to the Act of June 21, 1906, it will be helpful to have in mind the conditions existing when it was enacted. At one time the Kickapoos were a single tribe occupying a treaty reservation in Kansas; [4] but through dissensions and migrations they had come in 1906 to comprise three separate communities or tribes having distinct places of abode. One tribe was still located on the old treaty reservation in Kansas and had been given allotments there.[5] Another was located in the Republic of Mexico on a reservation set apart for them by that government. In the main this tribe comprised Kickapoos who had separated from the Kansas tribe and settled in Mexico, some in 1852 and others in 1863.[6] There were also later accessions as will appear presently. A third tribe

---

[4] Treaties of Oct. 24, 1832, 7 Stat. 391; May 18, 1854, 10 Stat. 1078.

[5] Treaty of June 28, 1862, 13 Stat. 623.

[6] Handbook of American Indians, Hodge, Vol. 1, pp. 684, 685; Art. X of Treaty of 1862 just cited; Annual Report of Commissioner of Indian Affairs 1872, title " Kansas," subtitle " Kickapoos."

was located in Oklahoma and chiefly comprised Kicka-
poos who had left the Mexican tribe and returned to the
United States, mostly in 1873.[7] A reservation in Okla-
homa (then the Indian Territory) was established for
them by executive order in 1883.[8] The lands in this res-
ervation were allotted among the members of this tribe in
1894,[9] the allotment to which this suit relates being one
which was made then. Some of the allottees on this res-
ervation removed to Mexico and established a residence
with the Mexican tribe; and some of the allottees of
neighboring Oklahoma tribes, such as Shawnees, Dela-
wares, Caddos and Wichitas, did likewise. Not infre-
quently allottees who had gone to the Mexican tribe gave
up their residence there and returned to Oklahoma. The
migration to and from the Mexican tribe, while intermit-
tent, was continuing when the Act of June 21, 1906, was
passed. The part of that act which is material here reads
as follows:

"All restrictions as to sale and incumbrance of all lands,
inherited and otherwise, of all adult Kickapoo Indians,
and of all Shawnee, Delaware, Caddo, and Wichita In-
dians who have heretofore been or are now known as
Indians of said tribes, affiliating with said Kickapoo In-
dians now or hereafter nonresident in the United States,
who have been allotted land in Oklahoma or Indian Ter-
ritory are hereby removed: *Provided,* That any such In-
dian allottee who is a nonresident of the United States
may lease his allotment without restriction for a period
not exceeding five years: *Provided further,* That the
parent or the person next of kin having the care and cus-
tody of a minor allottee may lease the allotment of said

---

[7] Annual Report Commissioner of Indian Affairs 1874, title
" Kansas," subtitle " Kickapoos."

[8] Kapler Indian Laws and Treaties, 2d ed., Vol. 1, 844; Annual
Report of Commissioner of Indian Affairs 1883, p. 45.

[9] Act March 3, 1893, c. 203, 27 Stat. 557.

minor as herein provided, except that no such lease shall extend beyond the minority of said allottee."

In any view of the act its words are not happily chosen. They are wanting in clarity and lend themselves to ambiguity. Both administrative officers and courts have found need for resorting to interpretation and construction when applying the act.

In *Johnson* v. *United States,* 283 Fed. 954, many conveyances—some by original allottees and some by heirs of such allottees—were assailed by the United States as made in violation of the restriction on alienation, and the defendant relied upon the act as having removed the restriction. Because of the varying facts relating to the several conveyances the act was considered from different angles. The principal question, common to all of the conveyances, was whether the main provision and the two provisos were inconsistent and mutually destructive. The District Court had held that they were, and therefore that the act was ineffective. But the Circuit Court of Appeals disapproved that view and, after observing that if reasonably possible the act should be so construed that the main provision and the provisos could stand together, came to the following conclusion [p. 955]:

"The purview discloses plainly and clearly a legislative intention to remove restrictions under given conditions; . . . when the whole paragraph is read with a view of sustaining it in all its parts the word ' otherwise,' in the second line, seems to be in contradistinction to allotment, so that it was clearly intended that all restrictions as to sale and incumbrance of lands, inherited or otherwise acquired (except allotments of surviving allottees), were removed under the conditions named."

In other words, that court construed the main provision removing restrictions under given conditions as not relating to lands acquired by direct personal allotment but only to those acquired in other ways, such as inheritance,

devise, etc., and construed the provisos permitting limited leases as relating only to lands acquired by direct personal allotments. On that basis the court proceeded to determine whether the facts shown brought any of the conveyances within the conditions named. As to the conveyances described in eleven out of fifty-four counts the court found that the lands were inherited and the grantors were heirs who came within the classes and conditions fixed in the act. In that connection the court said [p. 956]:

"And the counts each allege that the deceased ancestor was an absentee Shawnee allottee, a member of the absentee Shawnee tribe of Indians, that the grantor was his heir and conveyed his inherited interest in his ancestor's allotment; and the stipulation shows that each grantor was an absentee Shawnee Indian and had been allotted lands in his own right. We think it also fairly inferable from the record that the grantors had been allotted lands in Oklahoma or Indian Territory, and that they and their ancestors were affiliated with nonresident Kickapoos."

On these findings the conveyances described in the eleven counts were held valid and the decree of the District Court as to them was reversed. Of the conveyances described in the other counts the court briefly said that the facts obtained from the record did not support the claim of a removal of restrictions, and so the decree of the District Court cancelling those conveyances was affirmed.

Both parties acquiesce in and place some reliance on that decision. It is pertinent in so far as it holds that the Act of 1906 did not remove the restriction on alienation from an allotment during the life of the allottee. Under that holding, with which we are in accord, the allotment in question remained subject to the restriction throughout the life of the mother, the original allottee.

On other points the facts in the *Johnson* case and those in this are not alike. In that case none of the heir-

grantors was a Kickapoo. All were absentee Shawnees affiliated with the Kickapoos in Mexico. Here the heir-grantor was a Kickapoo permanently residing with the Kickapoos in Oklahoma when he inherited from his mother and continuously thereafter.

The defendant insists that the Act of 1906 makes a distinction between Kickapoos and Shawnees, etc., in that it removes the restriction on alienation as to the former regardless of their residence and as to the latter only where they reside outside the United States. No reason for making such a distinction is suggested; nor is any perceived by us. The relation of all these Indians to the United States was the same. All were emerging from the old Indian life—the Kickapoos not in advance of the others. Some of each of the designated tribes had migrated to Mexico and others of each were inclined to do so. It was this migration, accomplished and prospective, which led to the act. In short, the circumstances were such as to suggest that a line of distinction be drawn at residence in or out of the United States and not at membership in one or another of the designated tribes. This we think is what was intended. Although inartificially framed, the act taken as a whole comports with this view quite as well if not better than with the other, and due regard for the status and interests of the Indians affected, which always are to be considered in construing such laws,[10] requires that it be preferred and given effect. Therefore we conclude that the qualifying phrase " now or hereafter nonresident of the United States " applies to the Kickapoos as well as to the Shawnees, etc.

In *United States* v. *Estill*, 62 F. (2d) 620, the Circuit Court of Appeals applied the act as we construe it. That suit involved a conveyance by heirs of a Kickapoo who

[10] *Jones* v. *Meehan*, 175 U.S. 1, 10–11; *Minnesota* v. *Hitchcock*, 185 U.S. 373, 402; *United States* v. *Celestine*, 215 U.S. 278, 290; *Choate* v. *Trapp*, 224 U.S. 665, 675; *Carpenter* v. *Shaw*, 280 U.S. 363, 367.

had received an allotment in the Oklahoma reservation in 1894 and had died in Mexico in 1905. The heirs were Kickapoos who had received allotments in the same reservation in their own right. The court deemed their residence material and gave the matter particular attention. It said: " The lower court also found, and the proof sustains it, that I-nesh-kin and Nah-she-pe-eth [the heirs] ' were adults and residing in the Republic of Mexico on the twenty-first day of June, 1906, and thereafter.' " The conveyance was made on a later date. Thus the heirs' inherited ownership and their residence in Mexico coincided before the conveyance was made. On the facts recited the court ruled that the case came within the act, and accordingly sustained the conveyance.

That court disposed of the present case in the belief that its facts " are not substantially different from the facts in *United States* v. *Estill.*" Whether this belief was occasioned by some inadvertence does not appear. But the real fact shown by the evidence, found by the District Court, and not questioned by the defendant, is that the son, although at an earlier time a resident of Mexico, became an actual resident of the Kickapoo reservation in Oklahoma in 1920, and resided there continuously thereafter. The mother, the allottee, died in 1929. Then, and not before, the son became her heir and inherited the land. At no time with him did ownership of the land and nonresidence in the United States coincide. That he had been a nonresident for several years ending nine years before the mother died is not material. During that period he had no right in the land and the restriction was of no concern to him. When later on he inherited the land, nonresidence, the chief condition on which the act made removal of the restriction to depend, was wanting. He was then and thereafter an Indian, resident in the United States among the people of his tribe, and holding the land under the restricted trust patent given to his

mother. In our opinion such a situation was not within but outside the act, and the heir's conveyance to the defendant was void.

Apparently the act has been a source of much trouble,[11] and recently it has been repealed, but with saving clauses protecting rights lawfully acquired under it.[12]

*Decree reversed.*

---

[11] Annual Reports Commissioner of Indian Affairs, 1906, title "Kickapoos"; 1911, title "Mexican Kickapoo Indians"; Senate Reports, Vol. A, No. 5, 60 Cong., 1st Sess.; Senate Report No. 710, 72 Cong., 1st Sess.; House Report No. 1901, 72 Cong., 2d Sess.

[12] Act February 17, 1933, c. 97, 47 Stat. 819.