**Decided August 1, 1985**

231

232

COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS
COMMONWEALTH TRIAL COURT

CONCEPCION S. WABOL and ) CIVIL ACTION NO. 84-302
ELIAS S. WABOL, )
 )
 Plaintiff, )
 )
 vs. ) SUMMARY JUDGMENT
 )
FILOMENIA W. MUNA, )
VICTORINO U. VILLACRUSIS, )
PHILIPPINE GOODS, INC., )
and TRANSAMERICA CORP., )
 )
 Defendants. )
_____)

Plaintiffs have moved for summary judgment on Count IV of the Complaint and the defendants, Victorino Villacrusis, Philippine Goods, Inc., and Transamerica Corp., (referred to herein collectively as the defendants) have filed a cross motion to dismiss plaintiffs' complaint. The co-defendant, Filomenia W. Muna, is in apparent default.

The plaintiffs (sometimes referred to herein as Wabols) moved to strike the affidavit of defendant Victorino U. Villacrusis which purports to support the cross motion. At the oral argument of this matter the motion was granted as the affidavit does not comply with Com.R.Civ.P. 56(e).

## I. BACKGROUND

This case revolves around a 1978 lease between Filomenia W. Muna as lessor and Philippine Goods, Inc. as lessee. A copy of the eight-page lease is attached to the complaint and marked Exhibit 1. The Wabols claim to be the owner of the property described in the lease pursuant to a partition, apparently among several family members including Felomenia W. Muna. It is further claimed that they are entitled to the rent from the lease dating back to its inception in 1978. Defendant, Transamerica Corporation claims the right to possession to a portion of the leased premises by virtue of a sublease from Philippines Goods, Inc. Thus, the claim of Transamerica Corp. rests on the validity of the leasehold rights of Philippine Goods, Inc.

Count IV, to which plaintiffs motion is directed, asserts· that since the defendants are not persons of Northern Marianas descent, the lease is void under Article XII of the Constitution of the Northern Mariana Islands (Constitution).

Article XII of the Constitution provides:

Section 1: Alienation of Land.
The acquisition of permanent and long-term interests in real property within the Commonwealth shall be restricted to persons of Northern Marianas descent.

Section 2: Acquisition.
The term acquisition used in section 1 includes acquisition by sale, lease, gift, inheritance or other means. A transfer to a spouse by inheritance is not an acquisition under this section. A transfer to a mortgagee by means of a foreclosure on a mortgage is not an acquisition under this section if the mortgagee does not hold the permanent or long-term interest in real property for more than five years.

234

Section 3: Permanent and Long-term
 Interests in Real Property.
The term permanent and long-term interests in
real property used in section 1 includes freehold
interests and leasehold interests of more than
forty years including renewal rights.

Section 4: Persons of Northern Marianas
 Descent.
A person of Northern Marianas descent is a
person who is a citizen or national of the United
States and who is of at least one-quarter Northern
Marianas Chamorro or Northern Marianas Carolinian
blood or a combination thereof or an adopted child
of a person of Northern·Marianas descent if
adopted while under the age of eighteen years.
For purposes of determining Northern Marianas
descent, a person shall be considered to be a
full-blooded Northern Marianas Chamorro or
Northern Marianas Carolinian if that person was
born or domiciled in the Northern Mariana Islands
by 1950 and was a citizen of the Trust Territory
of the Pacific Islands before the termination of
the Trusteeship with respect to the Commonwealth.

Section 5: Corporations.
A corporation shall be considered to be a
person of Northern Marianas descent so long as it
is incorporated in the Commonwealth, has its
principal place of business in the Commonwealth,
has directors of at least fifty-one percent of
whom are persons of Northern Marianas descent and
has voting shares at least fifty-one percent of
which are owned by persons of Northern Marianas
descent as defined by section 4.

Section 6: Enforcement.
Any transaction made in violation of
section 1 shall be void ab initio. Whenever a
corporation ceases to be qualified under
section 5, a permanent or long-term interest in
land in the· Commonwealth acquired by the
corporation after the effective date. of this
Constitution shall be forfeited to the government.

II. IS THE LEASE ENTERED INTO BY THE DEFENDANT, PHILIPPINE

GOODS; INC. PROHIBITED BY ARTICLE XII?

The answers to requests for admissions demonstrate that

there is no genuine issue of fact as to the status of the

235

defendant Philippine Goods, Inc. There are three directors of Philippine Goods, Inc., Victorino U. Villacrusis, Maria N. Manalo, and Leonardo C. Villacrusis. Victorino U. Villacrusis and Leonardo C. Villacrusis are not persons of Northern Marianas descent. Thus, the corporation fails to meet the definition found in Section 5 of Article XII of the Constitution. Additionally, the ownership of the stock of Philippine Goods, Inc. is owned by persons of Northern Mraianas descent only to the extent of 50%.[1]

The lease provides for a 30-year term with an "Option to extend term of Lease" for an additional twenty years pursuant to paragraph 3 of the lease. Article XII of the Constitution proscribes the acquisition of a long-term interest in real property which is more than forty years including renewal rights (Sections 1 and 3). Though the defendants argue that the lease does not violate Article XII, it is found that it clearly does.

The distinctions the defendants argue between acquisition and renewal rights are not persuasive. Article XII addresses and includes a lease such as the one before the court. Simply stated, at the time of the execution of the lease, the defendant Philippine Goods, Inc. acquired a leasehold interest in land in the Commonwealth for more than forty years. The option to extend the lease does not depend on any act on the part of the lessor. It is strictly the option of Philippine Goods, Inc. To put it in the terms of Article XII, the lessee has a leasehold interest for

---

[1] These facts are obtained by reference to the responses to the plaintiffs' request for admissions, numbers 7 thru 12.

50 years including renewal rights. To accept defendants' argument, would result in an unintended and easy circumvention of the entire purpose of Article XII.[2]

Thus under the undisputed facts of this case, it is found that the lease is prohibited by Article XII.

### III. DO THE PLAINTIFFS HAVE STANDING TO SUE?

The troubling issue of standing to sue by the Wabols was raised at oral argument and if the Wabols do have standing, what is to be done about enforcing Article XII, assuming that Article XII is constitutional.

Article XII of the Cosntitution provides no hint as to who enforces its provisions. On the face of the complaint (which includes the referred to lease agreement as attached) the plaintiffs cannot be said to be the real parties interest in so far as any action on the lease is concerned. Com.R.Civ.P. 17(a).

Count IV is an action by the plaintiffs to enforce Article XII of the Constitution and have the court declare the lease void ab initio. Section 6 of Article XII states that in the case of a corporation, the prohibited interest in the land is forfeited to the government and not to the plaintiffs.

---

2/
Philippine Goods, Inc. essentially argues that it "acquired" only a 30 year lease and it would not acquire the extended 20 year term until it exercised the option in the year 2008. Thus, it is asserted, there is no breach of the 40 year term. Additionally, defendants argue that the Option to extend is not the same as renewal rights. Whatever appellation is used, it is concluded that Philippine Goods, Inc. acquired a 50 year leasehold interest including the extension, option or renewal rights, any of which brings the lease within the definition of the proscribed interest in Article XII of the Constitution.

It is the plaintiffs' position that whether or not they have a claim to the land, they, as persons of Northern Marianas descent, have the right to sue to enforce Article XII. This right is based on broad social and economic grounds.

 The history of the Constitutional Convention shows that the purpose underlying Article XII was to conserve the land of the Commonwealth for the indigenous people because of its limited quantity. (See, for example, Covenant to Establish a Commonwealth, § 805, Analysis of the Constitution, pp. 164-167, and Analysis of the Covenant to Establish a Commonwealth of the Northern Mariana Islands, pp. 116-118).

Plaintiffs argue that due to the significance of restrictions placed on alien property ownership in the Commonwealth, any person of Northern Marianas descent should be able to bring suit to enforce the provisions of Article XII. Otherwise, it is argued, the restrictions become meaningless since the seller or lessor who has received his/her price will not likely sue to cancel or rescind the very transaction he or she made. Equitable principles would appear to come into play under such circumstances.

Indeed, whoever has standing to object to any lease or sale of land in violation of Article XII is confronted with serious equitable questions. They are apparent here.

 It is held that the plaintiffs have alleged sufficient facts to give them standing. They allege they are the owners of the property, they are entitled to the rental from the property and the lease is in violation of the rights of the plaintiffs as

238

owners of the land. The essential element of the standing requirement is that "the plaintiff ... show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." <u>Gladstone, Realtors v Village of Bellwood</u>, 441 U.S. 91, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979).

Put another way, the party who invokes the court's authority requires the plaintiff to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision." <u>Valley Force Christian College v Americans United for Separation of Church and State, Inc.</u>, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

IV. CAN THE PROVISIONS OF ARTICLE XII OF THE CONSTITUTION OF THE COMMONWEALTH BE SUSTAINED IN VIEW OF THE EQUAL PROTECTION PROVISION OF THE COMMONWEALTH CONSTITUTION AND THE EQUAL PROTECTION PROVISION OF THE U.S. CONSTITUTION?

Article I, Section 6 of the Commonwealth Constitution provides:

> "No person shall be denied the equal protection of the laws. No person shall be denied the enjoyment of civil rights or be discriminated against in the exercise thereof on account of race, color, religion, ancestry or sex."

239

Pursuant to Section 501(a), Article V of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America (Covenant), Amendment XIV, Section 1 of the United States Constitution is applicable in the Commonwealth as if it were one of the several States of the United States.

It reads:

> Section 1. All person born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

The defendants argue that Article XII of the Commonwealth Constitution runs afoul of the equal protection clauses of both the Commonwealth Constitution and the United States Constitution.[3]

---

3/
The defendants also refer obliquely to the due process and privileges and immunities clauses of the respective Constitutions. But, as noted by defendants in their memorandum:

> "Two other potential basis for attacking the restriction on land alienation - the due process and privileges and immunities clauses .... As a practical matter, they are subsumed within the analysis of the primary issue: whether the classification drawn in the constitution separating those who are eligible to acquire long-term real property interests in the Northern Marianas from those who are not is constitutionally permissible. An equal protection violation may, as a matter of constitutional law, amount to a

██ There is no doubt that Article XII is discriminatory in nature. The privilege of acquiring and enjoying property or a long term interest therein is a basic right. _Truax v Corrigan_, 257 U.S. 312, 42 S.Ct. 124, 66 L.Ed. 254. To declare that only certain persons can have that right while others can not due to their ancestry is patently offensive to the equal protection clauses cited above. Indeed, the equal protection clause of the Commonwealth Constitution is more specific than that of the United States Constitution as the former prohibits discrimination on the basis of ancestry.

Notwithstanding these provisions, can Article XII still pass constititional muster?

██ The equal protection clause guarantees that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in like circumstances in their lives, liberty and property. _Truax v Corrigan_, supra; _Eldridge v Trezevant_, 160 U.S. 452, 16 S.Ct.

---

finding that the classification causes such invidious discrimination that it offends the guarantee of due process as well as that of equal protection and, hence, that the governmental interest served by the classification does not justify the resulting interference with the United States citizen's right to acquire property in the islands. Although equal protection and privileges and immunities claims have occasionally been treated separately, the constitutional analysis of the two issues has generally been merged into a single inquiry, couched largely in terms of equal protection." Citing 65 Georgetown Law Journal 1373, 1452; Sei Fuji v State, 38 Cal. 2d 718, 729-30, 242 P. 2d 617, 625 (1952); State v Oakland, 129 Mont. 347, 352, 287 P. 2d 39, 42 (1955).

345, 40 L.Ed. 490; _Halligan v Davis_, 146 U.S. 314, 13 S.Ct. 105, 36 L.Ed. 986.

The equal protection clause provides a basis for challenging legislative (or state constitutional) classifications that treat one group of persons as inferior or superior to others, and for contending that general rules are being applied in an arbitrary or discriminatory way. _Jones v Helms_, 452 U.S. 412, 101 S.Ct. 2434, 69 L.Ed. 118.

Purposeful discrimination is necessary to create a violation of the equal protection clause. _City of Mobile v Bolden_, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed. 2d 47.

The equal protection provisions apply to any person (and corporation) within the jurisdiction of the Commonwealth. Article 1, Section 6, Commonwealth Constitution; Amendment XIV, Section 1, U.S. Constitution. The clause is universal in its application to all persons within the territorial jurisdiction. _Yick Wo v Hopkins_, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220.

The equal protection clause of the Fourteenth Amendment does not prevent the states (Commonwealth) from making reasonable classifications among persons within the jurisdiction of the entity. _Western & Southern Life Ins. Co. v State Bd. of Equalization_, 451 U.S. 648, 101 S.Ct. 2070, 68 L.Ed. 2d 514.

If the classification rests on grounds wholly irrelevant to the achievement of any legitimate governmental objective, it will not pass constitutional muster. _Harris v McRae_, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed. 2d 784.

Article XII of the Commonwealth Constitution is somewhat more complex than the usual legislative enactment which is attacked on equal protection grounds.

The seed for Article XII probably was planted as far back as the Japanese administration of the Northern Mariana Islands which commenced in 1914. After the Japanese seized control of the Islands in 1914 from Germany, the amount of public land available for the inhabitants to use for residences and farms decreased drastically because the Japanese government developed large parcels of land for its sugar cane industry and for governmental or military purposes. The reservoir of extra land which existed in the German administration disappeared to a large extent. See, Land Tenure Patterns, Vol. 1, pp. 221-222.

Soon after the end of World War II, the United States administration recognized the limited amount of land and the importance of land for the subsistence economy of the islands and caused to be implemented a restriction on the alienation of land which was incorporated into the laws of the Northern Mariana Islands as well as the rest of the United Nations Trust Territory.[4]

---

[4] The first code of laws of the Trust Territory of the Pacific Islands was promulgated by Executive Order No. 32 on 12/22/52 by the High Commissioner. The Code was revised in 1959 by the High Commissioner and the 1966 edition of the Code incorporated, in Section 900, the restriction on the alienation of land. This same provision was re-incorporated into the 1970 edition of the Code as 57 TTC § 11101. Even prior to 1952, the almost complete domination by the U.S. military and isolation of the islands had the effect of prohibiting non-indigenous persons from purchasing land in the islands. Section 900 of the Trust Territory Code reads:
 "Only citizens of the Trust Territory may hold title to land in the Trust Territory; Provided, however, that

The desire of the people of the Northern Mariana Islands to maintain control over their land was exhibited during the negotiations with the United States when the Covenant was written. As a result, Section 805 of Article XIII was formulated and approved by the people of the Northern Mariana Islands and the United States Congress. Section 805 specifically gave the green light to "regulate the alienation of permanent and long-term interests in real property so as to restrict the acquisition of such interests to persons of Northern Mariana Islands descent." The response was the inclusion of Article XII of the Commonwealth Constitution which was subsequently approved by the electorate, and the Government of the United States pursuant to Article II, Section 201 and 202 of the Covenant.[5]

---

nothing herein shall be construed to divest or impair the right, title or interest of non-citizens or their heirs or devisees, in lands in the Trust Territory held by such persons prior to December 8, 1941, and which have not been vested in the Area Property Custodian by Vesting Order dated September 17, 1951, or, if vested, are released from the terms of said order by direction of the High Commissioner; Provided further, that nothing herein shall be construed to prevent the Government of the Trust Territory from holding title to lands in the Trust Territory."

5/
As might be expected, concern was expressed by several commentators as to the challenges to any restriction on land alienation which could be made in view of the equal protection provisions of the United States Constitution. See, Section by Section Analysis of the Covenant to Establish a Commonwealth of the Northern Mariana Islands, dated 2/15/75, pp. 116-118; Analysis of the Constitution of the Commonwealth of the Northern Mariana Islands, 12/6/76, pp. 163-167.

This case presents the first direct attack on the constitutionality of Article XII. Several cases before have skirted the issue and were decided on different grounds.[5]

The established rule is this court will not decide a constitutional issue when there are other avenues available and will strike down a provision as unconstitutional only where it is clear beyond reasonable doubt. <u>Camacho v Civil Service Commission</u>, CTC C.A. 80-11, aff'd 666 F.2d 1257.

In respect to possible alternate grounds to resolve this matter, the court is convinced that the constitutionality of Article XII must be determined as it is the crux of the dispute between the parties.

The unique content of Article XII is paralleled by the formulation and approval process which led to its existence. Article XII, has not only received the approval of the electorate of the Northern Mariana Islands and the President of the United States but the Covenant (including § 805) has been approved by the U.S. Congress and enacted as law. Joint Resolution of March 24, 1976, Public Law No. 94-241, 90 Stat. 263, <u>reprinted</u> <u>in</u> 48 U.S.C. § 1681 note.

The Fourteenth Amendment of the U.S. Constitution is a restriction on the Commonwealth Government but does not extend to

---

5/
On reflection, it appears that the previous cases also did not involve the high stakes represented here. The incentive to prosecute vigorously a constitutional issue of the magnitude involved in this case sometimes (usually?) requires fairly substantial economic rewards.

authority exercised by the government of the United States. _District of Columbia v Carter_, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed. 613.

This potential legal quagmire of dual approval is avoided, however, by the result hereinafter reached.

The ultimate question which must be answered is whether the _classification_ established in Article XII can pass equal protection scrutiny. There is no doubt that a state (Commonwealth) may classify persons and objects for the purpose of legislation. _District of Columbia v Brooke_, 214 U.S. 138, 29 S.Ct. 560, 53 L.Ed. 941; 16A AmJur 2d, _Constitutional Law_, § 746.

The classification embodied in Article XII is fairly clearly set forth. Those who have the unrestricted right to own fee simple interests or longer than 40 years leasehold interests in the Northern Mariana Islands are defined in Section 4. From the history of the formation of the Covenant and the Constitution and the wording in the respective documents, there is nò doubt there was a great consciousness about the importance of ownership of land in the Commonwealth because of the culture and traditions of the people of the Northern Mariana Islands. There was also grave concern about the potential for exploitation and the buying of land by "foreign" individuals and corporations which possessed the power to overwhelm the new and struggling Commonwealth.

In so far as the culture and traditions are concerned, they are imbedded in the everyday lives of the Chamorro and Carolinian people.

By the time of the Spanish administration period in the islands, the land tenure system for the Chamorros had become directed to individual ownerships as contrasted with clan or lineage ownership. At the same time the concept of family land arose ( _Iyon Manaina_) where the tendency was to keep the land within the family. This was (and still is) being done by a _partida_ whereby the head of the family divides the land among his/her issue or designate the land to go to certain issue. The most common event occurs when the father, as the head of the family, designates/divides the land for his sons with his spouse having a right akin to a life estate interest. The sons are expected to take care of their mother until her death. Any daughters are assumed to be taken care of by marrying males with land designated to them in a similar fashion in another family. Land Tenure Patterns, Vol 1, pp. 222-225; Spoehr, Fieldana; Anthropology, p. 133 et seq; _Estate of Torres_, CTC C.A. 79-163; _Estate of Camacho_, CTC C.A. 82-72; _Palacios v Coleman_, D.C. NMI C.A. 78-49.[7]

Carolinian land tenure is significantly different.[8] Land is owned by lineages with succession through the matrilineal

---

[7] The recently enacted Probate Code of the Commonwealth, Public Law 3-106, recognizes the concept of family land. The Code defines "Ancestors' Land" as that being acquired by a person from one or more Chamorro ancestors of Northern Marianas descent. Section 7(a), Chapter I. Section 2 of Chapter IX provides that intestate succession of ancestors' land is in equal shares to the surviving issue but with a life estate in the spouse.

[8] The Carolinian society in the Northern Mariana Islands developed shortly after the turn of the century when people from the atolls north and west of Truk came to the Marianas. They maintained their traditional land tenure pattern here.

members. Upon the death of an elder female member who holds the land in the form of a trust, the land is not divided but kept intact for the use of the lineage members. Ownership in the form of a trust relationship is passed down to the eldest surviving matrilineal member. Land Tenure Patterns, Vol. 1, pp 225-227.

However, the possibility of a _partida_ similar to Chamorro custom exists. _Estate of Taisakan_, CTC C.A. 79-107, aff'd D.C. NMI App. Div. DCA 81-9002.[9]

A survey of the various cases in this court which concern customary land rights and the fairly recent enactment of the Commonwealth Probate Code, Public Law 3-106, demonstrates very clearly that the indigenous people of the Northern Mariana Islands do recognize and follow the land customs established over the past many years. Section 805 of the Covenant is not a facade or ruse to give sanction to the formation and adoption of Article XII of the Constitution just so the people of Northern Marianas descent can have an economic advantage over persons not similarly situated.

The traditions, the culture, the importance of the ownership of land and the potential for exploitation by more powerful economic sources are real and not imagined.

---

9/
Public Law 3-106, the Probate Code, at Chapter 1, Section 7(1) defines "family land" and incorporates the traditional Carolinian trust arrangement. Chapter IX, Section 4 sets forth the succession of Carolinian family or lineage land which is essentially the same as set forth above.

Does this provide a sufficient basis to uphold Article XII in light of the Fourteenth Amendment to the U.S. Constitution? It is concluded that it is.

To begin with, the importance and strength of the Covenant cannot be ignored. Had Article XII strayed away from the meaning and intent of Section 805, another conclusion would result. However, Article XII complies and is compatible with Section 805. The only significant questions that had to be answered by the Constitution was the definition of "long-term interests" and "persons of Northern Marianas descent". The former is any lease or interest over forty years. This, certainly, is reasonable. The definition of persons of Northern Marianas descent is likewise reasonable. Only one-quarter blood is required and certain persons born or domiciled in the Commonwealth by 1950 are included.

It is concluded that Article XII as formulated by the Constitutional Convention and as approved by the electorate satisfies the terms of Section 805 of the Covenant and is well within the parameters specified.

That the Covenant is to be given significant weight and credence even if it should conflict with traditional notions of constitutional rights as might be applied in the United States, is now well settled. Commonwealth of the Northern Mariana Islands v Atalig, 723 F.2d 682 (9th Cir. 1984).

Atalig concerned the issue of whether the terms of the Covenant and Commonwealth Constitution relating to restricting jury trials in criminal cases could withstand attack on U.S.

constitutional grounds in light of Supreme Court cases declaring that the right to a jury trial is a fundamental right. The court rejected the application of the United States cases as they might apply to the Commonwealth and held, _inter alia_, that the U.S. Congress, exercising its power to administer territories under Article IV of the Constitution, had the flexibility to accomodate the particular social and cultural conditions of areas such as the Northern Mariana Islands. _Atalig_, supra, 723 F.2d at 690.

In addition to the support that can be derived from the Covenant and _Atalig_ for Article XII, it appears a close analogy can be drawn to the restriction of alienation of lands within Indian reservations in the United States itself.[10] The overall scheme, plan and reason for the restrictions is to prevent the exploitation of the Indians by persons who are in a stronger position, economically. _Federal Power Com. v Tuscarora Indian Nation_, 362 U.S. 99, 80 S.Ct. 543, 4 L.Ed.2d 584; _United States v Reily_, 290 U.S. 33, 54 S.Ct. 41, 78 L.Ed. 154; _Bunch v Cole_, 263 U.S. 250, 44 S.Ct. 101, 68 L.Ed. 290.

Traditional equal protection analysis, which requires a compelling state interest to justify invidious racial discrimination, does not apply to legislation on governmental action favoring Indians. _United States v Decker_, (1979, CA 9) 600 F.2d 733.

---

10/ The significant difference is, generally speaking, that the restriction on alienation of Indian lands is based on an allotment of land by the U.S. to an allottee and the restriction runs with the land and is not personal to the allottee. _Bowling v United States_, 233 U.S. 528, 34 S.Ct. 659, 58 L.Ed. 1080; _United States v Noble_, 237 U.S. 74, 80, 35 S.Ct. 532, 59 L.Ed. 844.

For many years it has been established that the U.S. Congress possesses the plenary power and duty to exercise care and protection of the Indians within the United States. _United States v McGowan_, 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410; _Sisseton v United States_, 277 U.S. 424, 48 S.Ct. 536, 72 L.Ed. 939. This power includes the right to impose restriction on the rights of Indian wards of the United States to deed or lease lands allotted to them. _Bunch v Cole_, supra.

This does not mean that all U.S. Congressional legislation is immune from judicial review of the U.S. Supreme Court. Challenges to legislation based on the equal protection component of the Fifth Amendment of the U.S. Constitution will be entertained. But, even then, the standard of review is that the legislative judgment should not be disturbed as long as the special treatment of the statute can be tied rationally to the fulfillment of Congress' unique obligation toward Indians. _Delaware Tribual Business Committee v Weeks_, 430 U.S. 73, 97 S.Ct. 911, 51 L.Ed.2d 173, rch den 431 U.S. 960, 97 S.Ct. 2688, 53 L.Ed.2d 279 - and reh den 431 U.S. 960, 97 S.Ct. 2688, 53 L.Ed.2d 279 an reh den 431 U.S. 960, 97 S.Ct. 2688, 53 L.Ed.2d 279.

Federal legislation with respect to Indian tribes which classifies and expressly singles out Indian tribes is provided for in Article 1, Section 8, Cl 3 of the United States Constitution, said clause giving Congress the power to regulate commerce with Indian tribes. _United States v Antelope_, 430 U.S. 641, 97 S.Ct. 1395, 51 L.Ed.2d 701.

The parallel of the power vested in the U.S. Congress relating to Indians (Art. 1, Sec. 8, Cl 3) and the power vested in Congress relating to the governing of the territories of the United States (Art. IV, Sec. 3, Cl 2) is apparent.

If the U.S. Congress can enact legislation to restrict the alienation of land allotted to Indians, it can also approve the Covenant which authorizes the establishment of restrictions on the alienation of land in the Commonwealth Constitution so long as the provisions in the Commonwealth Constitution are within the parameters of the terms in the Covenant and the provisions are tied rationally to the fulfillment of Congress' unique obligation toward the Commonwealth.

Consequently, it is held that Article XII of the Commonwealth Constitution can withstand scrutiny under the equal protection provisions of the Fourteenth Amendment of the United States Constitution and Article I, Section 6 of the Commonwealth Constitution and it is declared to be a fair and reasonable result of the direction and authority authorized by the U.S. Congress pursuant to its Constitutional powers attained in Art. IV, § 3, Cl 2 of the U.S. Constitution.

### V. REMEDIES

Turning now to the remedy and equitable considerations of this particular case, it is undisputed that Philippine Goods, Inc. and Transamerica Corp. have been paying rent on the subject premises for almost seven years and have placed on the property, at considerable expense, extensive improvements. At the time all of this economic activity occurred the Wabols stood by and did

not object. In fact, page 7 of the lease agreement shows them "approving" the lease. Classic examples of waiver, laches, and estoppel are presented. The plaintiffs answer that they only want to renogotiate the lease, is of no solace to the defendants. If the Wabols claim exhorbitant rent based partially or wholly on the defendants' own improvements, the defendants wind up with no lease.

The equities strongly favor the defendants and the court will search for an equitable and fair solution under the circumstances of the unique Constitutional provisions of Article XII.

The court is persuaded by defendants' argument to uphold the lease agreement to the maximum legal extent possible. Contracts are to be constructed in a manner so as to uphold their validity and consistent with applicable government laws designed to protect the contracting parties interests. Pine River Logging & Impr. Co. v U.S., 186 U.S. 279, 22 S.Ct. 920, 46 L.Ed. 1164.

If a contract is capable of a construction which will make it valid, legal, effective and enforceable, it will be given that construction. 17 AmJur 2d, Contracts, §254.

The closest analogy to this case appears to be those cases dealing with statutory or constitutional provisions restricting the terms of certain leases. 49 AmJur 2d, Landlord & Tenant, § 68. There appears to be a split of authority as to whether the prohibited lease is completely void or void only as to the excess. See 17 ALR 2d, pp 570-571. As might be anticipated, the statutory and constitutional provisions limiting the terms of

253

leases are limited in number and the cases construing them are mostly older cases. See, for example, <u>Tennessee Coal I&R Co. v Pratt Consol. Coal Co.</u>, 156 ALA 446, 47 SO 337; <u>Mass. Nat. Bank v Shinn</u>, 163 N.Y. 360, 57 N.E. 611.

It is held that the better and more enlightened rule and one which more effectively addresses the equities involved here is that leases which violate Article XII of the Constitution will be declared void only as to the excess term which violates the constitutional provisions of Article XII.

 This does not do violence to the first sentence in § 6 of Article XII which declares that any transaction in violation of the 40 year restriction is void <u>ab initio</u>. What is declared is that the lessees in this case had nothing more than a maximum 40 year lease from the outset.[11]

The defendants have filed a cross motion for summary judgment. In view of the court's conclusions on plaintiffs' motion, the matters raised by defendants are resolved. Pursuant to the stipulation and order dated January 17, 1985 all rental is now being deposited into a joint account.

IT IS ORDERED that plaintiffs' motion for summary judgment on Count IV is denied save and except to the extent that defendants have a lease on the subject premises for the term of

---

[11] If the defendants had been claiming an outright fee simple interest by virtue of a deed, then, of course, a completely different situation would be presented. A lease for a number of years can effectively be declared void as to any excess over the allowable term. A fee simple grant is not so flexible or divisible.

30 years, ending on January 1, 2009 and <u>only</u> an option to extend or renew for an additional 10 years to January 1, 2019.

Dated at Saipan, CM, this <u>31st</u> day of July, 1985.

_____
Robert A. Hefner, Chief Judge