**ESTORIL PRODUCING CORPORA-TION; Estoril, Inc.; Pete Temple; John D. Kubiak, Trustee of the Dazzo Children Trust; Sam L. Dazzo, Jr.; Ultimo Tempo Corp.; Estoril 1985, Ltd.; Estoril 1983, Ltd.; Fred M. Allison, III; Dr. Reeves L. Smith; Robert R. Shaw; J. Charles Hollimon; Robert H. Rex; George Haworth; NHM Co.; Southwest Royalties, Inc.; J. Frank Stringer, Jr.; James R. Spradlin, Trustee; William R. Austin; Ms. V.F. Barnett; Richard McCullough; Donald R. Ellison; Maintown Properties, a partnership; James W. Matheney, Jr.; Clark V. Matheney; Stringer Joint Venture d/b/a Stringer Oil and Gas, Appellants,**

v.

**David H. MURDOCK d/b/a International Mining Company; Brian Van Horn d/b/a Van Horn Oil Company; Ameroyal Energy Corporation; the Board of County Commissioners, Pottawatomie County, Oklahoma; Arnold Gaddy; Colonial Drilling & Exploration, Inc.; Patrick Christenson; and Steve Van Horn, Appellees.**

No. 71,692, No. 73,506.

Court of Appeals of Oklahoma,
Division No. 2.

Dec. 3, 1991.

H.B. Watson, Jr., Janis W. Preslar, Watson & McKenzie, Oklahoma City, for appellants.

Richard N. Steed, Shawnee, for appellee Arnold Gaddy.

Thomas A. Thompson, Asst. Dist. Atty., Shawnee, for Appellee Board of County Com'rs of Pottawatomie County.

## MEMORANDUM OPINION

MEANS, Presiding Judge.

Plaintiffs appeal from a grant of summary judgment in favor of defendant Gaddy. The judgment quieted title in defendant Gaddy's mineral leasehold estate located on the original allotment of a Mexican Kickapoo Indian. Having reviewed the record and applicable law, we reverse.

### I

The undisputed facts are as follows. Plaintiffs and defendant hold leases to the mineral rights in an area known as Tract B. The plaintiffs' lease, executed on October 5, 1980, was made with the heirs of Kah-Kah-to-the-Quah. Kah-Kah-to-the-Quah was a restricted Mexican Kickapoo Indian who received an allotment of 80 acres[1] which was to be held in trust by the United States in accordance with the allotment agreement made between Congress and the Kickapoo Indian Tribe in 1893.[2] Article IV

of this agreement allows the allottee's title to be held in trust according to the General Allotment Act of February 8, 1887.[3] Tract B, totaling 0.92 acre, is located within the restricted 80-acre allotment.[4]

Defendant Gaddy claims title to the minerals through a lease executed with the Pottawatomie County Board of Commissioners on May 19, 1986. The County Commissioners acquired their claim to Tract B by quit claim deed from the Chicago, Rock Island and Pacific Railway Company (C.R.I. & P.) on June 5, 1928.[5] C.R.I. & P. acquired its claim to Tract B on October 20, 1927, from Kah-Kah-to-the-Quah by way of a warranty deed conveying fee simple title.

The General Allotment Act, *supra,* placed restrictions on alienation of land allotted to Indians, including the land allotted to Kah-Kah-to-the-Quah. A prerequisite to any conveyance of restricted land was an application and approval process through the local Indian Agency (in this case, the Shawnee Indian Agency) and eventually the Secretary of the Interior. 25 U.S.C.A. § 405 (1983). In support of its claim that the requisite approval was not given, plaintiffs rely on an affidavit signed by Michael E. Burris, an attorney specializing in title examination, which stated that the conveyance of Tract B by Kah-Kah-to-the-Quah to C.R.I. & P. "does not reflect the approval of the Department of Interior, Bureau of Indian Affairs or any other governmental agency having jurisdiction over the allotment. Additionally, the records of the area office having jurisdiction over the Mexican Kickapoo Tribe does [*sic*] not contain a removal of such restrictions."

---

1. The 80 acres were described as the South Half (S/2) of the Southwest Quarter (SW/4) of Section 13, Township 10 North, Range 3 East of the Indian Meridian, less 6.80 acres in the Northeast Corner.

2. Ch. 203, 27 Stat. 557; W. Semple, *Oklahoma Indian Land Titles Annotated* 886–88 (1952).

3. 24 Stat. 388; now codified at 25 U.S.C. § 348.

4. Specifically, Tract B is located within the Southeast Quarter (SE/4) of the Southwest Quarter (SW/4) of Section 13.

5. C.R.I. & P. acquired the Choctaw, Oklahoma and Gulf Railroad (C.O. & G.) under the Act of March 3, 1905, 33 Stat. 991, Semple, *supra* § 350 (1952). C.O. & G. acquired the Choctaw Coal and Railway Company pursuant to 28 Stat. 502, on August 24, 1894. The Choctaw Coal and Railway Company was originally granted access to the Indian Territory under the Act of February 18, 1888, ch. 13, 25 Stat. 35.

The plaintiffs' evidence in support of their motion for summary judgment includes a "Schedule of Damages for additional Right-of-Way ...," executed on July 21, 1927, between Kah–Kah–to–the–Quah and C.R.I. & P. The Schedule of Damages was approved by the Shawnee Indian Agency through Lease Clerk Charles Dushane, who had been appointed by A.W. Leech, Supt. & S.D.Agt. of the Shawnee Indian Agency, to appraise the tracts of Indian land involved. The Schedule of Damages gives C.R.I. & P. a right-of-way easement through 7.44 acres within the South Half (S/2) of the Southwest Quarter (SW/4), less railroad right-of-way, Section 13, Township 10 North, 3 East of the Indian Meridian, in accordance with the Act of February 28, 1902, (Enid–Anadarko Act) 32 Stat. 43.

At a hearing on August 11, 1988, plaintiffs' Motion for Summary Judgment was denied and defendant Gaddy's Motion for Summary Judgment was granted. The court found Gaddy's title to be "valid, perfect and superior to any right or interest claimed by the plaintiffs...."

On appeal plaintiffs argue the trial court erred in finding implied approval by the Secretary of the Interior of the warranty deed executed on October 20, 1927, and witnessed by Charles Dushane. According to plaintiffs, this lack of approval makes the conveyance to C.R.I. & P. invalid. Plaintiffs also argue the railroad was only capable of taking a right-of-way easement, and not a fee simple title, to Tract B under either of two railroad enabling acts.

## II

■ The General Allotment Act, 25 U.S.C.A. § 405, *supra*, authorizes the sale of restricted Indian land within basic parameters:

Any noncompetent Indian to whom a patent containing restrictions against alienation has been issued ... may sell or convey all or any part of such allotment ... on such terms and conditions and under such rules and regulations as the Secretary of the Interior may prescribe ... under the supervision of the Commissioner of Indian Affairs; and any

conveyance made hereunder and approved by the Secretary of the Interior shall convey full title to the land.... *Id.*

The basic requirements listed are: 1) the conveyance must be on such terms and conditions and under such rules and regulations as the Secretary may prescribe, 2) the conveyance must be under the supervision of the Commissioner of Indian Affairs, and 3) approval of the conveyance must be made by the Secretary of the Interior.

The Oklahoma Supreme Court addressed the issue of whether the Secretary of the Interior had approved the conveyance of restricted land in *Rogers v. Noel*, 34 Okl. 238, 124 P. 976 (1912). In *Rogers* a Choctaw Indian attempted to convey, by warranty, his allotment. The United States Indian Agent at Muskogee recommended that the restrictions on the sale of the land be removed. The Secretary of the Interior approved the recommendation, but stated that approval would be effective only after the expiration of thirty days. However, the deed was made before the expiration of the thirty days. The Oklahoma Supreme Court held the deed invalid because the Secretary of the Interior had not put his approval in writing. "Only in this manner did the allottee have the right to alienate, and, without this being done and until the expiration of the time fixed in the order of approval in which it might be done, any attempted conveyance was void." *Id.* at 240, 124 P. at 977.

■ None of the three requirements of the Act are evidenced by looking at the warranty deed of October 20, 1927, which purports to convey fee simple title to defendant Gaddy's chain of title. There was no approval by the Secretary of the Interior as required by the Act and by the court in *Rogers;* therefore, we agree with plaintiffs that the conveyance from Kah–Kah–to–the–Quah of fee simple title to C.R.I. & P. is invalid.

■ Defendant attempts to show that the conveyance met the requirements of the Allotment Act by intertwining two transactions involving C.R.I. & P., Kah–Kah–to–the–Quah and Charles Dushane (as

a witness) to show implied approval of the warranty deed by the Secretary of the Interior. On July 21, 1927, Dushane was properly acting as an agent of the Shawnee Indian Agency when he approved the Schedule of Damages. The Schedule contains a statement by A.W. Leech, "Supt. & S.D.Agt." of the Shawnee Indian Agency, certifying Dushane as the representative of the Agency to appraise the tracts of land involved and assess the monetary damage due the Indian allottee of said lands. Three months later, Dushane witnessed the warranty deed dated October 20, 1927. However, this warranty deed does not contain a statement by A.W. Leech certifying Dushane's actions to be those of the representative of the Shawnee Indian Agency. Nevertheless, defendant contends that the continuity of the transactions (same parties, same property, and Dushane's signature) creates inferred approval of the warranty deed by the Secretary of the Interior even though actual approval is absent from the second instrument.

Defendant relies on the following language from *St. Louis & S.F. Ry. v. Skelton*, 42 Okl. 266, 269, 141 P. 440, 441 (1914):

> Hence, as we view the case at bar, it is unnecessary to determine whether or not, under the act of February 28, 1902, the approval of the Secretary of the Interior was necessary to give validity to the deed. There is nothing in the record to show that he did not approve same, and under the foregoing authority, in the absence of any proof to the contrary, the legal presumption is that the deed was valid.

However, the *Skelton* facts are not sufficiently similar to defendant's situation for defendant to rely on them. The argument in *Skelton* involved the quieting of title to property which had been condemned by the railroad. The condemnation procedure in effect at that time, when fulfilled, permitted the implied approval by the Secretary of the Interior. The issue in the case at bar, however, involves the ability of an original Indian allottee to convey a fee simple title to a railroad without indication that the restrictions had been removed or that the Secretary of the Interior had

granted approval of the conveyance. Defendant's argument that a legal presumption exists under *Skelton* that the warranty deed was approved is misplaced due to the dissimilar material facts of *Skelton* and the case at bar.

The General Allotment Act, 25 U.S.C. § 405, sets forth an outline for the sale of land by a restricted Indian. The defendant has failed to show the Secretary of the Interior's approval of the warranty deed as required by that Act. Therefore, this failure to provide evidence of an application and approval process culminating in the grant of approval of the Secretary of the Interior of the October 20, 1927, warranty deed invalidates the conveyance from the original allottee to C.R.I. & P., and hence, invalidates defendant Gaddy's claim to a valid mineral lease.

### III

As an alternative argument, plaintiffs also question the authority of C.R.I. & P. to take a fee simple title from an Indian allottee even if the conveyance meets the requirements of the General Allotment Act.

As explained earlier, Kah-Kah-to-the-Quah was originally allotted an area containing Tract B according to an agreement made between Congress and the Kickapoo in 1893. According to the affidavit from Burris referred to above, "the Choctaw Coal and Railway Company, or its successors, either under authority of the Act of February 18, 1888, 25 Stat. 39, as amended, or under authority of the Act of February 28, 1902, 32 Stat. 43, (Enid–Anadarko Act)", were the original railroads to gain a right-of-way to Tract B. Therefore, plaintiffs argue that C.R.I. & P. obtained a right-of-way pursuant to one of these acts.

The Act of February 18, 1888, *supra*, allows for a main line, a branch line and "the right to construct, use, and maintain such tracks, turnouts, branches, and sidings and extensions as said company may deem it in their interest to construct along and upon the right of way and depot grounds herein provided for." Further, the Act specifies:

That no part of the lands herein authorized to be taken shall be leased or sold by the company, and they shall not be used except in such manner and for such purposes only as shall be necessary for the construction and convenient operation of said railroad, telegraph, and telephone lines; and when any portion thereof shall cease to be so used, such portion shall revert to the nation or tribe of Indians from which the same shall be taken.

*Id.* at § 2.

■ The Enid–Anadarko Act, *supra,* became effective on February 28, 1902.[6] It has been said that under the Enid–Anadarko Act, no fee simple title to restricted land passes and only surface rights are transferred. Semple, *supra* at pp. 271–72. Therefore, regardless which act C.R.I. & P. was operating under, the railroad was only authorized to acquire a right-of-way which would revert to the original allottee should the land cease to be used by the railroad. The railroad was not entitled to acquire fee simple title to restricted land.

In *St. Louis–San Francisco Ry. v. McBride,* 104 Okl. 216, 231 P. 284 (1924), the railroad sought the ejectment of defendant McBride who had converted ground belonging to the railroad under a right-of-way easement which had been condemned under the Enid–Anadarko Act. The defendant claimed title to the land by adverse possession. The court analyzed the effect of adverse possession on condemned land and concluded that:

> [Case law] uniformly hold[s] that under such a grant the railroad company could not alienate this land as it pleased, and that if the railroad company could not alienate this land at its will, it was not subject to being acquired by adverse possession by others. In other words, the land could not be lost by indirection

where it could not have been conveyed directly.

*McBride,* 104 Okl. at 220, 231 P. at 287.

Similarly, by operating under either the Act of February 18, 1888, *supra,* or the Enid–Anadarko Act, *supra,* C.R.I. & P. could not have conveyed a fee simple title for Tract B because it was not authorized to acquire a fee simple title. It could not convey what it did not have.

## IV

Therefore, we find that the trial court erred in granting summary judgment to defendant Gaddy. We reverse and remand with instructions to the trial court to enter judgment in favor of plaintiffs consistent with this opinion.

RAPP, J., concurs, and BRIGHTMIRE, J., concurs in part and dissents in part.

BRIGHTMIRE, Judge, concurring in part and dissenting in part

I concur in vacating the summary judgment in favor of defendant Gaddy. Neither the provisions of the Indian General Allotment Act nor the subsequent acts amending and redefining it permit removal of restrictions on alienation of trust lands by implication. And even if approval of a transfer of an Indian allotment during the statutory trust period is given by an agent of the Bureau of Indian Affairs, the sale is void if the agent had no approval power. *Bacher v. Patencio,* 232 F.Supp. 939, 941 (S.D.Cal.1964), *aff'd* 368 F.2d 1010 (9th Cir. 1966). There is no evidence that anyone at the Shawnee Indian Agency with approval power approved the lease. Charles Dushane, a lease clerk who appraised the property, is not shown to have been acting in other than an individual capacity when he witnessed the thumbprint of Kah–Kah–to–the–Quah on October 20, 1927. As a result, Gaddy's approval-by-implication theory must fail.[7]

---

6. "[Rail][r]oads built subsequent to the passage of this [Enid–Anadarko] act have conformed to the provisions of the Enid & Anadarko Act," Semple, *supra* at § 357.

7. I wish to point out, however, that the reliance of the majority on *Rogers v. Noel* is misplaced since that case involved a member of the five civilized tribes whose lands were not governed by the General Allotment Act of February 8, 1887, as was the Kickapoo land in question.

I dissent, however, from directing summary judgment for the plaintiffs. The record before us is not sufficient for this court to direct summary judgment as a matter of law. Gaddy's lease is void because the underlying conveyance was made during the trust period and there is no evidence the restrictions were ever removed from the trust lands by the secretary of the interior. Restrictions on alienation of trust lands are not personal to the original allottee, but run with the land. *United States v. Reily*, 290 U.S. 33, 54 S.Ct. 41, 78 L.Ed. 154 (1933); *Couch v. Udall*, 404 F.2d 97 (10th Cir.1968); *United States v. Kilgore*, 111 F.2d 665 (10th Cir. 1940); 25 U.S.C.A. § 348. Although restrictions on alienation by absentee heirs of original Mexican Kickapoo allottees were removed by the Act of June 21, 1906, 34 Stat. 325, 362–363, they were reimposed by the Act of February 17, 1933, 47 Stat. 819. The record before us contains no proof they have since been removed. The result is that the plaintiffs' lessors may be without authority to encumber the mineral estate and we may be dealing with not one, but two void transactions. This presents a question of fact precluding summary judgment for the plaintiffs.

Moreover, the plaintiffs fail to trace their purported chain of title, and present no evidence that their lessors are in fact the heirs of the original allottee, or that they represent all the heirs of Kah–Kah–to–the–Quah having a legal interest in the land. When an allottee dies without a will, during the trust period and before issuance of fee simple patent, "the Secretary of the Interior, upon notice and hearing ... shall ascertain the legal heirs of such decedent, and his decision thereon shall be final and conclusive." 25 U.S.C.A. § 372. Without such a determination of heirship, the plaintiffs are "without right to maintain this [quiet title] suit." *Bertrand v. Doyle*, 36 F.2d 351 (10th Cir.1929). As a result, it is my opinion that this court is without authority as a matter of law to quiet title in the plaintiffs.

I also dissent from the discussion in Part III of the majority opinion. Gaddy does not claim the railroad acquired fee simple title under the Enid–Anadarko Act. It is not disputed that the Act prohibits railroads from acquiring fee simple title under the Act to land taken for right-of-way purposes. Nothing in the Act, however, prohibits a railroad from acquiring fee simple title to restricted Indian lands by other means, provided the requisite approval is obtained from the secretary of the interior. *Bailey v. Banister*, 200 F.2d 683 (10th Cir. 1952). Here it is merely coincidental that the land covered by the void warranty deed was earlier committed to right-of-way use. Title is claimed under the warranty deed, not the Act. As a result, I do not consider the discussion in Part III to be relevant to the issue before us, and dissent from the blanket statement that the "railroad was not entitled to acquire fee simple title to restricted land."

It is my opinion that the record before us is inadequate to quiet title, and presents unresolved questions of fact precluding this court from directing summary judgment on remand. I would vacate the judgment appealed and remand for further proceedings.