## SISSETON AND WAHPETON BANDS OF SIOUX INDIANS *v.* UNITED STATES.

No. 596. Argued April 27, 1928.—Decided May 28, 1928.

*Mr. Thomas Sterling,* with whom *Messrs. Robert T. Tedrow* and *Walter W. McCaslin* were on the brief, for appellants.

*Assistant Attorney General Galloway,* with whom *Solicitor General Mitchell* was on the brief, for the United States.

MR. JUSTICE STONE delivered the opinion of the Court.

Appellants filed their petition in the Court of Claims under the Act of April 11, 1916, c. 63, 39 Stat. 47, printed in the margin so far as material,[1] conferring on the Court

---

[1] "That all claims of whatsoever nature which the Sisseton and Wahpeton bands of Sioux Indians may have or claim to have against the United States shall be submitted to the Court of Claims, with the right to appeal to the Supreme Court of the United States by either party, for the amount due or claimed to be due said bands from the United States under any treaties or laws of Congress; and jurisdiction is hereby conferred upon the Court of Claims to hear and determine all claims of said bands against the United States and also any legal or equitable defense, set off, or counterclaim which the United

of Claims jurisdiction to hear and determine all claims of the Sisseton and Wahpeton bands of Indians against the United States. The Court of Claims on its findings of fact and conclusions of law gave judgment dismissing the petition. 58 Ct. Cls. 302. This Court denied an application for certiorari. 275 U. S. 528. The present appeal was taken under Act of Congress approved March 4, 1927, c. 522, 44 Stat. Part III, p. 1847. It specifically granted to appellants one year from date within which to appeal and was intended, we think, to confer a right of appeal as distinguished from the right to petition for certiorari within three months of the judgment, conferred by §§ 3 and 8 of the Jurisdictional Act of February 13, 1925.

Appellants ask review by this Court of four items of their claim, all of which were denied by the court below. All involve the question, among others, whether under the special act conferring jurisdiction on the Court of Claims the authority of that court was limited to adjudicating the rights of appellants arising under treaties and statutes of the United States, in accordance with accepted principles of law and equity, or whether it could go behind those treaties and statutes and allow recovery of amounts not authorized to be paid by them, on grounds of inadequacy of consideration and mistake.

States may have against said Sisseton and Wahpeton bands of Sioux Indians, and to enter judgment, and in determining the amount to be entered herein the court shall deduct from any sums found due said Sisseton and Wahpeton bands of Sioux Indians any and all gratuities paid said bands or individual members thereof subsequent to March third, eighteen hundred and sixty-three; Provided, That in determining the amount to be entered herein, the value of the land involved shall not exceed the value of such land on March third, eighteen hundred and sixty-three. If any such question is submitted to said court it shall settle the rights, both legal and equitable, of said bands of Indians and the United States, notwithstanding lapse of time or statute of limitations."

The four items of claim now presented differ in some respects from the claims set up in the petition. The facts now relied on, so far as disclosed by the findings, to which the consideration of this Court is limited, may be summarized as follows:

I.

## APPELLANTS' CLAIM FOR ADDITIONAL COMPENSATION FOR LANDS CEDED UNDER THE TREATY OF 1858.

This claim is in substance founded upon an asserted difference between the value of certain lands of petitioners and the amount allowed and paid for them under treaties of the United States with the Indians and subsequent action taken under them. The Court of Claims found that the petitioners were two bands of the Sioux Indians, having their habitat prior to July 3, 1851, along the upper Minnesota River. On that date they negotiated a treaty with the United States, later modified by the Senate of the United States, and as modified ratified by the Indians and the United States Government in September, 1852. 10 Stat. 952, 958. The treaty ceded to the United States all the lands of petitioners in the territory of Minnesota and Iowa.

By Article III as originally drafted reservations for the petitioners were set apart along the Minnesota River and following the negotiations of the treaty the petitioners, together with two other bands, the Wahpakoota and Medawakanton Indians, were removed to those reservations. These provisions for reservations for the four bands were stricken out of the treaty as ratified and a new provision substituted that the Indians should be paid ten cents an acre for these lands, payment to be in lieu of the reservations as originally provided for in Art. III of the Treaty as negotiated, the sum so paid to be added to the trust fund for the Indians provided for in other sections of the

treaty. The sum so paid and allotted to the trust fund amounted to $112,000. The President of the United States was authorized to set apart another reservation for these bands of Indians outside of the ceded territory, but no other reservation was in fact so set apart under the provisions of this treaty.

By Treaty of June, 1858, 12 Stat. 1031, 1037, it was stipulated that those portions of the reservations lying south of the Minnesota River should constitute reservations for the four bands with provisions for allotment and that the disposition to be made of the portions of the reservations on the north side of the river should be left to the United States Senate for decision. Senate Resolution of June 27, 1860, 12 Stat. 1042, provided that the Indians should be allowed 30¢ an acre for the lands lying on the north side of the river. These lands consisted of 469,000 acres for which the Indians were paid $170,880, payment being provided for by the Act of March 2, 1861, c. 85, 12 Stat. 221, 237.

In August, 1862 and until 1864, the Sisseton and Wahpeton bands participated in an outbreak of the Sioux Indians, during which many white settlers were massacred, and large amounts of property destroyed. In consequence, Congress, by Act of February 16, 1863, abrogated all treaties between them and the United States, declared all their lands and rights of occupancy within the State of Minnesota and all annuities and claims previously accorded to them forfeited and provided for payment of the damages suffered by citizens in consequence of the outbreak from funds of the Indians in the hands of the Government. By Act of March 3, 1863, lands in the reservation on the south side of the Minnesota River were sold, the Sisseton and Wahpeton bands ultimately receiving from the sale $647,457. The Court of Claims found that the value of these lands on March 3, 1863, was $1.25

an acre. The appellants argue here that as these lands were worth $1.25 an acre March 3, 1863, the lands on the north side of the river were worth that amount when sold for 30¢ an acre three years before, June 27, 1860, and that they are now entitled to recover the difference, aggregating $541,120 between the value so ascertained and the amount actually received from the sale, on the ground that there must have been a material mistake of the parties as to the value of the land and that the jurisdictional Act under which this suit was brought authorized the recovery of the value of the land as of March 3, 1863.

## II.

### Appellants' Claim for Compensation Arising Under the Act of March 3, 1863, 12 Stat. 819.

Following the Sioux Indian outbreak of 1862 Congress, by Act of March 3, 1863, c. 119, 12 Stat. 819, provided that the President should set apart for the Sisseton and Wahpeton bands, among others, unoccupied lands outside the limits of any state sufficient to provide each member willing to adopt the pursuit of agriculture with eighty acres of agricultural land. Shortly afterwards such lands were so designated and set apart at Crow Creek on the Missouri River in Dakota territory. At this time, as a result of military operations against the Indians, two hundred and ninety-five full blood Indians of the Sisseton and Wahpeton bands, and one hundred and twelve half breeds of the four bands were military prisoners at Fort Snelling. They, with prisoners of other bands, were removed to the reservation at Crow Creek, arriving there about May 30th of that year, and lands were then finally set apart for them in the following July. Military operations were continued until 1864, during which most of the other members of the bands were driven out of the State

of Minnesota to points west of the Missouri River and into Canada. After the cessation of military operations, these other members of the two bands, numbering in 1866 between six hundred and eight hundred, gathered and settled near Fort Wadsworth in the eastern part of Dakota territory where, with the acquiescence of the Government, they remained until 1867 when the Lake Traverse and Devil's Lake reservations were set apart for them.

In the meantime an unsuccessful effort had been made by the Government to negotiate a treaty with these fragments of the bands for the extinguishment of their claim to lands in the Dakota territory, which claims were considered doubtful because the lands were claimed by other Indians. It does not appear that any material numbers of additional members of the bands went to the Crow Creek reservation or how many, if any, were willing to adopt the pursuit of agriculture.

By Art. II of the Treaty of February 19, 1867, the Sisseton and Wahpeton bands ceded to the United States the right to construct wagon roads, railroad and telegraph lines and other public improvements across the lands claimed by them and described in the treaty, and in consideration of the " confiscation of all their annuities, reservations and improvements " by the Government, it was provided that there should be set apart a permanent reservation for such members of the bands as had not been sent to the Crow Creek reservation. Such reservations were set apart, which became known as the Lake Traverse and Devil's Lake reservations. On the basis of these findings appellants contend that under the Act of March 3, 1863, they were entitled to recover the value of an allowance of eighty acres of agricultural land for each member of the bands, aggregating 322,080 acres of land, which, at $1.25 an acre, found by the Court of Claims to be the value at that date, amounts to $402,600.

III.

APPELLANTS' CLAIM FOR COMPENSATION FOR LANDS AL-
LEGED TO HAVE BEEN CEDED BUT NOT PAID FOR UNDER
THE TREATY OF SEPTEMBER 20, 1872.

By Act of June 7, 1872, c. 325, 17 Stat. 281, the Secre-
tary of the Interior was directed to report to Congress
what title or interest the Sisseton and Wahpeton bands
had in any portion of the land described in the second
article of the Treaty of February 19, 1867, under which
the Lake Traverse and Devil's Lake reservations were
set apart, and also " whether any, and if any, what com-
pensation ought in justice and equity to be made to the
said bands of Indians respectively for the extinguishment
of whatever title they may have to said lands." Under
the statute the Secretary appointed a commission to make
an investigation of the Indians' title to the land and if it
found such title to be valid and complete to negotiate for
the relinquishment of the title upon terms " at once favor-
able to the government and just to the Indians."

On October 3, 1872, the commission reported that prior
to the treaty of February 19, 1867, the title to the tract
of the Sisseton and Wahpeton bands was doubtful, as
other bands of Sioux Indians claimed a common interest
in the lands, but that the United States had, by that
treaty, recognized the title of the Sisseton and Wahpeton
bands and was by it estopped from denying their title.
The commission reported that it estimated the tract of
land to have an area of over eight million acres and that
the value of the lands should be fixed at the sum of
$800,000, although the Indians urged $200,000 more than
this sum as the proper value and one of the commissioners
was of the opinion that $800,000 was more than should
be allowed.

The commission submitted with its report a proposed treaty which it had negotiated with the Indians under date of September 20, 1872 (Kappler's Indian Laws & Treaties, Vol. 2, p. 1057), under which the bands were to cede all their interest in the lands as well as all lands in the territory of Dakota, except the Lake Traverse and Devil's Lake reservations. The principal, but not the only consideration, was the $800,000, payable to the Indians in annual installments of $80,000 each, without interest.

By Act of February 14, 1873, c. 138, 17 Stat. 437, 456, Congress ratified and confirmed that portion of the treaty providing for the cession of the lands and the payment of $800,000, and appropriated $80,000 for the first installment payment. The treaty, as thus amended, and confirmed by Congress, was ratified by the Indians May 2, 1873 (Kappler's Indian Laws and Treaties, Vol. 2, p. 1059). The stipulated annual installments were appropriated and paid, the appropriation acts providing that the several installments were " for the relinquishment by said Indians of their claim to or interest in the land described in the second article of the Treaty made with them February 19, 1867." 18 Stat. 167, 441; 19 Stat. 192, 287; 20 Stat. 81, 310; 21 Stat. 127, 497; 22 Stat. 81.

In making the treaty or agreement of September 20, 1872, it was the belief and understanding of the parties that the approximate area of the tract of land to be sold and ceded by the Indians was eight million acres. In fact, the actual area of the land, as later determined, was eleven million acres. The Court of Claims found that the value of the land was not satisfactorily shown by the evidence either on March 3, 1863, or at the time of the making of the agreement or treaty.

Appellants contend that there was a mutual mistake of fact as to the quantity of land ceded and that the

Court of Claims should have awarded compensation at the rate of 10¢ an acre for the three million acres of land in excess of the eight million acres which was supposed to be the approximate area of the land at the time of the agreement.

## IV.

APPELLANTS' CLAIM FOR PAYMENT OF THE PRINCIPAL OF THE TRUST FUND CREATED UNDER THE TREATY OF JULY 23, 1851.

The Treaty of July 23, 1851, provided for the creation of a trust fund to be paid by the Government to the Sisseton and Wahpeton bands for the cession by them of lands to the Government under this treaty. It was provided that the fund should be held by the Government and 5% interest on it paid annually by the Government to the Indians for a period of fifty years, which payments when completed were to be full payment of and to extinguish the trust fund. Under the treaty as submitted to the Senate for ratification, the amount of the trust fund was designated as $1,360,000, but under the treaty as amended by the Senate and ratified by the Indians, this amount was increased to $1,472,000.

Until the Indian outbreak of 1862 and the Act of February 16, 1863, the Government paid the stipulated annual payments and, notwithstanding the forfeiture of their rights by the Act of February 16, 1863, the Government has, under subsequent acts of Congress, accounted to the Indians for the remaining payments covering the entire fifty year period, less such amounts as were paid to citizens for damages sustained by them by reason of the outbreak.

The petitioners claim the right to recover the full principal sum set apart for them in addition to the installments paid which, alone, the treaty authorized, on the

ground that as the specified fund was designated as a trust fund the obligation of the Government with respect to it could not be discharged by the payment of an amount equivalent to annual interest upon the fund for fifty years, and also because the Court of Claims found that some members of the two bands did not understand at the time the treaty was made that the payment of interest on the trust fund for fifty years was to be in full payment of the principal, and did understand that at the end of the fifty-year period the principal was also to be paid over to the Indians.

It will be observed that of the four claims, Claims I, III, and IV are based on alleged mistakes which are urged as a sufficient basis for disregarding the express provisions of the treaties and statutes concerned, Claim I being based on an alleged mistake as to the value of the land purchased under a treaty; Claim III being based on a supposed mistake as to the amount of land purchased by the Government for a lump sum under a treaty, and Claim IV being based upon an alleged mistake of individual members of the bands as to the amount to be paid under the Treaty of July 23, 1851, although the Court of Claims found that it did not appear that their representatives, the chiefs and headmen who negotiated the treaty, did not understand the provisions of it.

It is also to be noted that there are no specific findings, supporting the claims, that the stipulated payments referred to in Claims I, III and IV were based on mistake or that different amounts would have been stipulated for and paid, had the parties or either of them been aware of the supposed mistakes or the equitable considerations now pressed upon us. To supply the lack of such findings petitioners are compelled to rely on inferences which they seek to draw from the facts as found and already stated in this opinion.

If we were to assume that the act conferring jurisdiction on the Court of Claims in this case is broad enough to allow a recovery based upon mistakes or other considerations inducing the treaties and acts of Congress with which we are now concerned we should find it difficult to discern in the findings any basis for the inferences necessary to support a recovery on such a theory. But we think it plain that that act only gave authority to the Court of Claims to hear and determine claims " for the amount due or claimed to be due said bands from the United States under any treaties or laws of Congress." It does not purport to alter or enlarge any rights conferred on petitioners by the treaties or laws of the United States or authorize any recovery except in accordance with the legal principles applicable in determining those rights under laws and treaties of the United States. See *United States* v. *Old Settlers,* 148 U. S. 427, 468, 469; *United States* v. *Mille Lac Chippewas,* 229 U. S. 498, 500.

To give the relief now sought it would be necessary to render a judgment predicated upon the abrogation of express provisions of the treaties and statutes concerned and the substitution for them of other provisions which Congress has never enacted or authorized. These are political, not judicial powers. The Act does not purport to bestow such powers on the Court of Claims and it would require resort to a violent and inadmissible presumption to infer any such purpose in the act. Cf. *United States* v. *Old Settlers, supra;* and see *Lone Wolf* v. *Hitchcock,* 187 U. S. 553, 567.

The second claim stands upon a somewhat different footing, but here also are wanting findings of fact essential to support the claim. The Act of March 3, 1863, directed the President to set aside for the Sisseton and Wahpeton bands, lands sufficient in extent to enable them to assign to each member of the band " who is willing to adopt the pursuit of agriculture, eighty acres of agricultural land,"

but there is no finding showing how many, or that any of the Indians were willing to follow the pursuit of agriculture after the adoption of the Act of March 3. Hence there is no foundation for any recovery which might be awarded on the basis of allotments to which only those members of the band were entitled who were willing to follow the pursuit of agriculture.

So far as those members of the band in amity with the United States were concerned, the findings show that they were provided for in the Crow Creek reservation set apart under the act of Congress. Appellants' present claim extends to those who were then in active hostility to the United States, the subject of its military operations and who were fleeing from capture by the military arm of the Government. The Act of March 3, 1863, passed at the very time of these operations could not, we think, have been intended for the benefit of those Indians who were then in open hostility to the Government and who for that reason did not avail of its benefits or comply with the conditions.

Nor can it now be deemed the basis of any claim for damages against the United States cognizable by a court— a conclusion at which we arrive quite independently of any consideration of the fact that the United States later made provision for these hostile and fugitive members of the two bands in the Lake Traverse and Devil's Lake reservations. Jurisdiction over them and their tribal lands was peculiarly within the legislative power of Congress and may not be exercised by the courts in the absence of legislation conferring rights upon them such as are the subject of judicial cognizance. See *Lone Wolf* v. *Hitchcock, supra,* 565; *Cherokee Nation* v. *Hitchcock,* 187 U. S. 294; *Stephens* v. *Cherokee Nation,* 174 U. S. 445, 483. This the jurisdictional Act of April 11, 1916, plainly failed to do.

*Affirmed.*