**UNITED STATES of America,**
Appellant,

v.

**Earl WEST, Elsie West, Arlo West, Glen West, Dorothy West (a minor), and Rosalind West (a minor), Appellees.**

No. 14854.

United States Court of Appeals
Ninth Circuit.

April 19, 1956.

Rehearing Denied May 25, 1956.

Perry W. Morton, Asst. Atty. Gen., Roger P. Marquis, Reginald W. Barnes, attorneys, Department of Justice, Washington, D. C., Jack D. H. Hays, U. S. Attorney, Phoenix, Ariz., for appellant.

Frank E. Flynn, Moeur & Moeur, W. A. Moeur, Phoenix, Ariz., for appellee.

Before STEPHENS and POPE, Circuit Judges, and MATHES, District Judge.

MATHES, District Judge.

This appeal is from a judgment dismissing, after trial on the merits, the Government's suit commenced May 19, 1954, to enjoin an alleged continuing trespass upon lands of the Fort Apache Indian Reservation.

There appears to be no controversy as to the facts. The trial court found inter alia:

"That one Corydon C. Cooley, a white man, about the year 1872 married Mollie Pinal, Apache Indian, and that shortly after their marriage they began raising cattle in the vicinity of McNary and Pinetop, Territory of Arizona. That they raised and grazed cattle on what is now a part of the Indian Reservation. That on or about April 5, 1873, there was born to the said Corydon C. Cooley and Mollie Pinal, a daughter Bell Cooley, who became a registered member of the Apache Tribe; and on or about April 17, 1894, married a white man named Abraham Amos.

"That shortly after the marriage of Bell C. Cooley and Abraham Amos they settled in the vicinity of Big Spring in the Territory of Arizona and in 1906 there was born to the said Abraham Amos and Bell C. Cooley, a daughter, the * * * [appellee] Elsie Amos, now Elsie West.

"That * * * [appellee] Earl West [not an Indian] is the husband of * * * Elsie West; that they were married in 1922 and ever since have been husband and wife.

"That * * * Earl West and Elsie West have grazed cattle on the Fort Apache Indian Reservation since about 1923 and that the * * [appellees], other than Lonnie West, who are children of said Earl West and Elsie West, have owned and grazed cattle on the said reservation for several years prior to 1953 * * *."

The District Court further found that in 1926 and again in 1936 the Superintendent of the Reservation "gave permission to the Amos and West family to graze cattle on part of the reservation * * *"; and "that since 1924 the * * * [appellees] have made valuable improvements on the said premises near Big Spring * * * Said improvements consist of dwelling houses, fences, wells (drilled and dug), and water tanks. That Abraham Amos and his wife, the former Bell C. Cooley, made their residence upon the reservation, and that * * * [appellees] have maintained their respective dwelling places on the reservation and on the same premises where they were given permission to graze cattle in the area of Big Spring. * * * That none of the * * * [appellees] has ever applied for membership in an Indian Livestock Association on the Fort Apache Indian Reservation."

The trial court also found:

"That the United States of America is the owner of the lands in the State and District of Arizona identified as the Fort Apache Indian Reservation, and said lands were reserved for the use and benefit of the White Mountain Apache Tribe by the Act of Congress dated June 7, 1897.

"That the White Mountain Apache Tribe of the Fort Apache Indian Reservation * * * adopted a Constitution and By-Laws on August 15, 1938, in accordance with Section 16 of the Indian Reorganization Act of June 18, 1934, (48 Stat. 984) and as amended by the Act of June 15, 1935, (49 Stat. 378), and said Constitution and By-Laws were approved by the Assistant Secretary of the Interior on August 26, 1938, and Article VIII thereof provides:

" 'The general control of the reservation lands and other tribal property shall continue as heretofore, until changed in any particular by ordinance. The reservation land now unallotted shall remain tribal property and shall not be allotted to individuals in severalty, but assignment of land for private use may be made by the Council in conformity with ordinances which may be adopted on this subject, provided the vested rights of members of the tribe are not violated. Right of occupancy of long established allocations or dwelling places and improvements made by individuals or families on tribal lands shall be confirmed by the Council through appropriate ordinances.'

"That the Council of the White Mountain Apache Tribe on August 3, 1953, enacted an ordinance known as Ordinance No. 22, which was approved by the Superintendent of the Fort Apache Agency within ten days after its enactment and was approved by the Assistant Secretary

of the Interior on November 3, 1953, and said Ordinance became effective on the date of its approval by the Superintendent on August 7, 1953, and Article III thereof provides:

" 'This ordinance shall apply to all lands within the Fort Apache Indian Reservation as defined in Article I, of the Constitution * *, Provided, that the rights accruing to members of the Tribe under Article VIII of the Constitution are not hereby jeopardized or abrogated in any way, and Provided Further That right of occupancy of reservation lands shall not include exclusive grazing privileges or rights not otherwise provided by this Ordinance and nothing in this Ordinance shall affect adversely the rights of individuals to their home sites or dwelling places.

" 'Consideration shall be given by the Council in actions taken to carry out the provisions of this ordinance to the rights of tribal members to ownership of improvements placed on tribal grazing lands. Any member who is adversely affected by action of the Council pursuant to this ordinance may present a claim to the Council covering improvements. In giving consideration to such claims the Council shall take into account proof of ownership of the improvements by the claimant, the authority under which the claimant operated in placing such improvements and the unamortized value of the improvements in view of the length of time used together with the use value of the tribal land during tenure by the claimant. Settlement of such claims shall be negotiated between the Council and the claimant if possible, with the provision that claims which cannot thus be settled satisfactorily may be referred to the Department of the Interior whose judgment shall be binding on both parties or the claimant, if he prefers may submit the claim to a court of proper jurisdic-

tion in which case the Council shall arrange to defend the interests of the Tribe.' "

From the facts found the learned District Judge concluded that:

"The defendants have acquired rights of occupancy on the reservation lands of long established allocations and have made improvements on such lands within the meaning and protection of Article VIII of the Tribal Constitution.

"Ordinance No. 22 of the White Mountain Apache Tribe is ineffectual to change or abrogate the rights of defendants on the reservation lands."

■ The Fort Apache Indian Reservation was created by Act of June 7, 1897, 30 Stat. 62, 64. The lands comprising the reservation are held in trust by the Government for the occupancy and benefit of the members of the White Mountain Apache Tribe. Ibid.: Shoshone Tribe of Indians v. United States, 1937, 299 U.S. 476, 497, 57 S.Ct. 244, 81 L.Ed. 360; cf. United States v. Creek Nation, 1935, 295 U.S. 103, 55 S.Ct. 681, 79 L.Ed. 1331.

Thus the White Mountain Apaches have "the usual Indian right of occupancy with the fee in the United States." United States v. Creek Nation, supra, 295 U.S. at page 109, 55 S.Ct. at page 684. And more than a century ago it was said to be "a settled principle, that their right of occupancy is considered as sacred as the fee-simple of the whites." Mitchel v. United States, 1835, 9 Pet. 711, 746, 34 U.S. 711, 746, 9 L.Ed. 283.

■ Jurisdiction over the Indians and their tribal lands is "peculiarly within the legislative power of Congress". Sisseton and Wahpeton Band of Sioux Indians v. United States, 1938, 277 U.S. 424, 437, 48 S.Ct. 536, 540, 72 L.Ed. 939. But Congress has no power to give the use of tribal lands to others, or to appropriate them to public uses, without giving "just compensation" therefor as required by the 5th Amendment. U. S.

Const. Amend. V; United States v. Santa Fe Pac. R. Co., 1931, 314 U.S. 339, 345, 62 S.Ct. 248, 86 L.Ed. 260; Shoshone Tribe of Indians v. United States, supra, 299 U.S. at page 497, 57 S.Ct. at page 251; United States v. Creek Nation, supra, 295 U.S. at page 110, 55 S. Ct. at page 684.

For to deprive the tribe of right of occupancy, without just compensation, "would not be an exercise of guardianship, but an act of confiscation." Lane v. Pueblo of Santa Rosa, 1919, 249 U.S. 110, 113, 39 S.Ct. 185, 186, 63 L.Ed. 504.

■ Even if the lands in question were part of the unsettled public domain, no official of the Government would be empowered to grant grazing rights thereon without authority from Congress. Cf. Royal Indemnity Co. v. United States, 1941, 313 U.S. 289, 295, 61 S.Ct. 995, 85 L.Ed. 1361.

Prior to the Taylor Grazing Act, 1934, 48 Stat. 1269, 43 U.S.C.A. § 315 et seq., there was held to be "an implied license, growing out of the custom of nearly a hundred years, that the public lands of the United States * * * shall be free to the people who seek to use them, where they are left open and uninclosed, and no act of government forbids this use." Buford v. Houtz, 1890, 133 U.S. 320, 326, 10 S.Ct. 305, 307, 33 L.Ed. 618.

But it was pointed out in Omaechevarria v. Idaho, 1918, 246 U.S. 343, 38 S.Ct. 323, 62 L.Ed. 763 that: "Congress has not conferred upon citizens the right to graze stock upon the public lands. The government has merely suffered the lands to be so used." 246 U.S. at page 352, 38 S.Ct. at page 327; see Light v. United States, 1911, 220 U.S. 523, 31 S.Ct. 485, 55 L.Ed. 570.

With the Taylor Grazing Act, Congress revoked this indiscriminate "implied license" in favor of an express statutory permit; and as Judge Stephens explained for the Court in Osborne v. United States, 9 Cir., 1944, 145 F.2d 892: "It is safe to say that it has always been the intention and policy of the govern-

ment to regard the use of its public lands for stock grazing, either under the original tacit consent or * * * under regulation through the permit system, as a privilege which is withdrawable at any time for any use by the sovereign without the payment of compensation." 145 F.2d at page 896.

■ It is settled that: "With respect to the public domain, the Constitution vests in Congress the power of disposition and of making all needful rules and regulations. That power is subject to no limitations." Gibson v. Chouteau, 1871, 13 Wall. 92, 99, 80 U.S. 92, 99, 20 L.Ed. 534; cf. Utah Power & Light Co. v. United States, 1917, 243 U.S. 389, 405, 37 S.Ct. 387, 61 L.Ed. 791; Oman v. United States, 10 Cir., 1952, 195 F.2d 710; Garcia v. Sumrall, 1942, 58 Ariz. 526, 121 P.2d 640.

■ It is also beyond question that "the government has, with respect to its own lands, the rights of an ordinary proprietor, to maintain its possession and to prosecute trespassers." Camfield v. United States, 1897, 167 U.S. 518, 524, 17 S.Ct. 864, 866, 42 L.Ed. 260.

■ The fact that the lands involved here are held by the Government in trust for the Indians affords no basis for distinguishing appellees' claims to vested and exclusive grazing rights from those of any citizen who has for years gratuitously grazed his cattle on the public domain. For with respect to the public domain not reserved for the Indians, it has been declared that: " 'All the public lands of the nation are held in trust for the people of the whole country.' " Light v. United States, supra, 220 U.S. at page 537, 31 S.Ct. at page 488.

The permission gratuitously granted by the Superintendent of the Reservation did not even purport to grant appellees any non-revocable right; and moreover could not in any event have greater legal force than a mere license at the sufferance of the Government, terminable at any time. Omaechevarria v. Idaho, supra, 246 U.S. at page 352, 38 S.Ct. at

page 326; Light v. United States, supra, 220 U.S. at page 535, 31 S.Ct. at page 487.

■ Nor can any equitable estoppel be invoked against the Government under the facts at bar. The Superintendent of the Reservation "was obviously without authority to dispose of the lands, and could not estop it from asserting rights of the United States * * * which he could not surrender." State of Utah v. United States, 1932, 284 U.S. 534, 545–546, 52 S.Ct. 232, 235, 76 L.Ed. 469; Cramer v. United States, 1923, 261 U.S. 219, 234, 43 S.Ct. 342, 67 L.Ed. 622.

■ Since not even Congress could lawfully dispose of the rights of the Indian tribe to possession, occupancy and use of the lands in question without payment of just compensation, United States v. Santa Fe Pac. R. Co., supra, 314 U.S. at page 345, 62 S.Ct. at page 251, "it is enough to say that the United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit." Utah Power & Light Co. v. United States, supra, 1917, 243 U.S. at page 409, 37 S.Ct. at page 391.

■ It follows that so long as the lands of the Fort Apache Indian Reservation are held by the United States in trust for the White Mountain Apache Tribe, Congress has "the power to control their occupancy and use, to protect them from trespass and injury, and to prescribe the conditions upon which others may obtain rights in them * * *." Utah Power & Light Co. v. United States, supra, 243 U.S. at page 405, 37 S.Ct. at page 389; cf. 25 U.S.C.A. § 461.

It was stipulated at the bar upon oral argument that the Fort Apache Reservation contains approximately 2,000,000 acres of grazing land, and that the White Mountain Apache Tribe includes some 1200 families. So if the grazing rights were equally divided, there would be some 1600 acres of grazing available for each family, as contrasted with some 30,000

acres which appellees, a single family, here claim to have acquired as a "long established allocation" by free use and the Superintendent's gift.

Admittedly the Government is vested with legal title. It must be conceded as well that any license appellees may have had to occupy the lands at the sufferance of the Government has been terminated. Hence, as between the Government and appellees, the latter are now clearly trespassers. 1 Restatement, Torts, §§ 158(b), 171, 174, 176; Lee v. Johnson, 1950, 70 Ariz. 122, 216 P.2d 722.

Accordingly the Government is entitled to an injunction restraining further trespass, thus vindicating the right to possession and occupancy held in trust for the Tribe.

What has been said applies only to appellees' rights in this suit as between them and the Government. Rights of occupancy, as well as claims covering improvements, which appellees who are members of the Tribe may in common fairness and good conscience assert as against other members of the Tribe under Article VIII of the Tribal Constitution, and Ordinance No. 22 adopted pursuant thereto, 25 U.S.C.A. § 476, is a matter for determination by the Council of the Tribe, who are admonished in Article VIII that: "Right of occupancy of long established allocations or dwelling places and improvements made by individuals or families on tribal lands shall be confirmed by the Council through appropriate ordinances."

If appellees who are tribal members seek the relief to which they may be entitled under the Tribal Constitution and ordinances, this Court cannot assume that the Tribal Council "would fail in the performance of any duty imposed * * * by the Constitution", and deny them justice. Yakus v. United States, 1944, 321 U.S. 414, 434, 64 S.Ct. 660, 672, 88 L.Ed. 834.

The judgment of dismissal is reversed and the cause remanded for further proceedings consistent with this opinion.