FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

JAN 15 2016

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff - Appellant, v. ESTATE OF E. WAYNE HAGE; WAYNE N. HAGE, Defendants - Appellees. | No. 13-16974 D.C. No. 2:07-cv-01154-RCJ-VCF OPINION |

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, District Judge, Presiding

Argued and Submitted December 9, 2015, as to Appellant and Estate of Hage[*]
San Francisco, California

Before: Susan P. Graber, Kim McLane Wardlaw, and Mary H. Murguia, Circuit Judges.

Opinion by Judge Susan P. Graber

GRABER, Circuit Judge:

---

[*] The panel unanimously concludes that this case is suitable for decision without oral argument as to Appellant and Wayne N. Hage. Fed. R. App. P. 34(a)(2).

The United States brought this action for damages and injunctive relief against E. Wayne Hage (now deceased) and his son, Wayne N. Hage, alleging that they grazed cattle on federal lands without a permit or other authorization. The district court found that, in fact, the Hages had grazed cattle on federal lands without a permit or other authorization. The court nevertheless ruled almost entirely against the government by holding—contrary to longstanding binding precedent—that the Hages' water rights provided a defense to the government's claims of trespass. The district court also ruled against the government on a counterclaim—filed at the district court's invitation—even though the counterclaim plainly was barred by the statute of limitations. Finally, the district court held two federal agency officials in contempt of court for their ordinary actions, lawfully carried out within the scope of their regulatory and statutory duties, despite the fact that the actions had no effect whatsoever on this case. In this opinion, we vacate in part and reverse in part the judgment on the merits, and we remand for further proceedings before a different district judge. In a separate disposition filed today, we reverse the findings of contempt against the government officials.

FACTUAL AND PROCEDURAL HISTORY

Beginning in 1978, E. Wayne Hage ("Hage Senior") grazed cattle on federal lands managed by the Bureau of Land Management ("BLM") and the United States Forest Service. Early on, he applied for and received the necessary grazing permits. In 1993, Hage Senior filed an application for renewal of the grazing permit, but the BLM denied it because, in its view, the application had not been completed properly. Hage Senior has not held a federal grazing permit since the early 1990s; his son, Wayne N. Hage ("Hage"), has never held a federal grazing permit. Despite the lack of a permit or other authorization, the Hages continued to graze cattle on federal lands.

The United States filed this action in federal district court in Nevada, alleging that, between 2004 and 2008, the Hages intentionally grazed cattle on federal lands without a permit or other authorization. After Hage Senior died, his estate was substituted as a defendant. The government moved for summary judgment, which the district court denied because of its idiosyncratic view that Defendants' water rights—perfected by Defendants' predecessors-in-interest in the late 1800s and early 1900s—provided a defense to the government's action. The court also noted that, "[a]lthough the Hages may or may not be able to bring a counterclaim[,] . . . the Court invites them to try."

3

Defendants then filed an amended answer that included counterclaims against the government, including an alleged violation of the Administrative Procedure Act ("APA"). The government moved to dismiss the APA counterclaim on the ground that neither the BLM nor the Forest Service had taken any "final agency action" under the APA within the applicable six-year statute of limitations. The district court denied the government's motion to dismiss the APA counterclaim, reasoning that "[t]he United States . . . has taken 'final agency action' by filing the present lawsuit."

After a 21-day bench trial, the district court ruled almost entirely in favor of Defendants. On the government's claims of trespass, the court concluded that, by virtue of their water rights, Defendants have an easement by necessity to access the water on public lands. The court further concluded that the easement allowed Defendants to bring cattle with them onto federal lands. The court also concluded that, because it is infeasible to prevent cattle from eating or wandering, the government cannot succeed on trespass claims if the cattle stayed within a reasonable distance of a water source to which Defendants possess water rights. Correctly recognizing that its determination of an appropriate distance was "arbitrary," the court selected one-half mile. Applying that newly minted legal standard to the facts of the case, the court found that, although the government

4

proved that cattle under Defendants' control had grazed extensively on federal lands, the government had proved trespass as to only two of its many trespass claims because all other unauthorized grazing occurred within a half mile of a water source. The court awarded the government $165.88 in damages.

On the counterclaim, the district court held that Defendants had proved a procedural due process violation. The court issued a wide-ranging injunction against the government, including a requirement that the federal agencies obtain permission from the court before issuing trespass notices against Defendants and a requirement that the agencies issue grazing permits to Defendants. The court concluded that it would retain "continuing jurisdiction to enforce this Order and Injunction."

The government timely appeals.

## STANDARDS OF REVIEW

We review de novo questions of law. Kohler v. Presidio Int'l, Inc., 782 F.3d 1064, 1068 (9th Cir. 2015). We review for clear error the district court's findings of fact. Addington v. US Airline Pilots Ass'n, 791 F.3d 967, 982 (9th Cir. 2015).

## DISCUSSION

A.    Trespassing Claim

Article IV of the Constitution states: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ." U.S. Const. art. IV, § 3, cl. 2. "That power is subject to no limitations." United States v. West, 232 F.2d 694, 698 (9th Cir. 1956) (quoting Gibson v. Chouteau, 80 U.S. (13 Wall.) 92, 99 (1871)); see also McFarland v. Kempthorne, 545 F.3d 1106, 1112 (9th Cir. 2008) ("The Property Clause gives Congress plenary power to regulate the use of federal land."). "The United States can prohibit absolutely or fix the terms on which its property may be used." Light v. United States, 220 U.S. 523, 536 (1911). "It is also beyond question that 'the government has, with respect to its own lands, the rights of an ordinary proprietor, to maintain its possession and to prosecute trespassers.'" West, 232 F.2d at 698 (quoting Camfield v. United States, 167 U.S. 518, 524 (1897)).

Before the enactment of the Taylor Grazing Act in 1934, longstanding custom allowed persons to use open, unreserved federal lands for the purpose of grazing stock. Buford v. Houtz, 133 U.S. 320, 326 (1890); West, 232 F.2d at 697. But the Supreme Court consistently referred to that custom as an "implied license," Buford, 133 U.S. at 326, and the Court explained in 1918 that "Congress has not conferred upon citizens the right to graze stock upon the public lands. The

6

government has merely suffered the lands to be so used." Omaechevarria v. Idaho, 246 U.S. 343, 352 (1918); see also Light, 220 U.S. at 535 ("There thus grew up a sort of implied license that these lands, thus left open, might be used so long as the government did not cancel its tacit consent. Its failure to object, however, did not confer any vested right on the complainant, nor did it deprive the United States of the power of recalling any implied license under which the land had been used for private purposes." (citation omitted)).

"With [the enactment of] the Taylor Grazing Act, Congress revoked this indiscriminate 'implied license' in favor of an express statutory permit . . . ." West, 232 F.2d at 697. The Taylor Grazing Act authorized the Secretary of the Interior "to issue or cause to be issued permits to graze livestock" pursuant to "his rules and regulations." 43 U.S.C. § 315b. In 1950, Congress granted the same authority to the Secretary of Agriculture with respect to national forests. Act of Apr. 24, 1950, ch. 97, § 19, 64 Stat. 82, 88, codified at 16 U.S.C. § 580*l*. In 1976, Congress enacted the Federal Land Policy and Management Act of 1976 ("FLPMA"), which provides specific guidance to the Secretaries in implementing the federal grazing permit systems. Pub. L. No. 94-579, § 402, 90 Stat. 2743, 2773, codified at 43 U.S.C. § 1752; see also 43 U.S.C. § 1740 (authorizing the

7

Secretaries to promulgate "rules and regulations to carry out the purposes of this Act").

All three Acts clearly state that the issuance of a permit does not create any property rights. See 43 U.S.C. § 315b ("[T]he issuance of a permit pursuant to the provisions of this subchapter shall not create any right, title, interest, or estate in or to the lands."); 16 U.S.C. § 580*l* ("[N]othing herein shall be construed as limiting or restricting any right, title, or interest of the United States in any land or resources."); 43 U.S.C. § 1752(j) ("Nothing in this Act shall be construed as modifying in any way law existing on October 21, 1976, with respect to the creation of right, title, interest or estate in or to public lands or lands in National Forests by issuance of grazing permits . . . ."). Accordingly, we long have held that a grazing permit "has always been a revocable privilege" and is not a "property right[]." Swim v. Bergland, 696 F.2d 712, 719 (9th Cir. 1983); accord West, 232 F.2d at 697–98; Osborne v. United States, 145 F.2d 892, 896 (9th Cir. 1944).

The ownership of water rights provides a substantial benefit to an applicant for a grazing permit. By statute, the federal agencies generally must give preference to owners of water rights. See, e.g., 43 U.S.C. § 315b ("Preference shall be given in the issuance of grazing permits to . . . owners of water or water rights . . . ."). Additionally, the federal agency granting a grazing permit to those

8

who own water rights often need not include the requirement—common to other grazing permits, such as those in the record here—that the recipient haul water to the site.

But the ownership of water rights has <u>no effect</u> on the requirement that a rancher obtain a grazing permit (or other grazing authorization) before allowing cattle to graze on federal lands. In <u>Hunter v. United States</u>, 388 F.2d 148 (9th Cir. 1967), we held that, pursuant to the Mining Act of 1866 and another Act, an owner of water rights possessed a right of way over federal lands for the purpose of diverting the water by "the construction of ditches and canals."[1] <u>Id.</u> at 154 (quoting Act of July 26, 1866, ch. 262, § 9, 14 Stat. 251, 253, <u>codified at</u> 43 U.S.C. § 661 (1866); 30 U.S.C. § 51 (1866)). But we made clear that an owner of water rights possessed a right of way <u>only</u> for those diversionary purposes. <u>Id.</u> We expressly rejected the rancher's argument that water rights entitled him to an appurtenant right to graze or to any "additional or other easements." <u>Id.</u> Accordingly, we held

---

[1] The FLPMA repealed the portion of the Mining Act of 1866 that guaranteed a right of way for the purpose of constructing ditches and canals. 43 U.S.C. § 661 note. But the FLPMA expressly provided that the Act did not affect any existing rights of way. <u>See</u> 43 U.S.C. § 1769(a) ("Nothing in this subchapter shall have the effect of terminating any right-of-way or right-of-use heretofore issued, granted, or permitted."). Because Defendants' predecessors-in-interest obtained their water rights well before 1976 (the enactment date of the FLPMA), that repeal does not affect this case.

that the rancher "is not entitled to an easement to graze livestock on the lands within the boundaries of the [federal lands]" but that "he should be allowed a right of way over those lands to divert the water by one of the methods contemplated by the [Mining Act of 1866]." Id. Both the Tenth and Federal Circuits have agreed. See Diamond Bar Cattle Co. v. United States, 168 F.3d 1209, 1214–15 (10th Cir. 1999) (following Hunter and rejecting ranchers' argument that they have an appurtenant right to graze); Estate of Hage v. United States (Hage VIII), 687 F.3d 1281, 1290 (Fed. Cir. 2012) (holding that "water rights do not include an attendant right to graze" but that the government may not "prevent all access to such water rights"); see also Colvin Cattle Co. v. United States, 67 Fed. Cl. 568 (2005) (following Hunter and Diamond Bar and concluding that water rights contain no appurtenant right to graze and contain only a right of access for diversion); Gardner v. Stager, 892 F. Supp. 1301, 1303–04 (D. Nev. 1995) (holding that the argument that the ranchers' "predecessors acquired vested water rights and that grazing rights are 'appurtenant' to such water rights . . . was expressly rejected long ago" (citing Hunter, 388 F.2d at 153–55)).[2]

---

[2] Although Hunter did not rely on this reasoning, the Taylor Grazing Act's granting of preference in the permitting process to owners of water rights strongly suggests that Congress did not intend grazing rights to follow from water rights without a permit. 43 U.S.C. § 315b. If owners of water rights did not need to

(continued...)

In sum, an owner of water rights has special privileges when applying for a grazing permit and has a right to access federal lands for the sole purpose of diverting the water. But an owner of water rights—like all other persons—may graze cattle on federal lands only if he or she has obtained a grazing permit or other grazing authorization. Water rights are irrelevant to that basic requirement.

Between 2004 and 2008, Defendants' cattle grazed frequently on lands owned by the United States. Neither Hage Senior nor Hage held a grazing permit or other grazing authorization during that time. Accordingly, Defendants violated applicable federal statutes and regulations, as well as the state law of trespass. See 43 U.S.C. § 1733(g) ("The use, occupancy, or development of any portion of the public lands contrary to any regulation of the Secretary or other responsible authority . . . is unlawful and prohibited."); 43 C.F.R. § 4140.1(b)(1) (prohibiting persons from "[a]llowing livestock . . . to graze on or be driven across [federal] lands: (i) Without a permit or lease or other grazing use authorization"). See generally 43 C.F.R. subpart 4150 (governing "Unauthorized Grazing Use"). See

---

[2](...continued)
obtain permits at all, the provision would be a nullity. See, e.g., Ciolino v. Frank (In re HP Inkjet Printer Litig.), 716 F.3d 1173, 1184 (9th Cir. 2013) ("Under accepted canons of statutory interpretation, we must make every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." (internal quotation marks and alterations omitted)).

also West, 232 F.2d at 699 ("[T]he Government is vested with legal title. It must be conceded as well that any license appellees may have had to occupy the lands at the sufferance of the Government has been terminated. Hence, as between the Government and appellees, the latter are now clearly trespassers.").

The district court nevertheless concluded that, because of their water rights, Defendants have an "easement by necessity" to access the water sources. That conclusion squarely contravenes Hunter. As discussed above, Hunter held that an owner of water rights has an easement for diversionary purposes only, and it rejected the argument that water rights entitle the owner to any "additional or other easements." 388 F.2d at 154.

The district court's theory also fails for several additional, independent reasons. We briefly mention two. First, the "easement by necessity" test fails on its own terms. For example, the requirement that "the unity of title was severed by a conveyance of one of the parcels," McFarland, 545 F.3d at 1111 (internal quotation marks omitted), is not met because there has never been a severance of title. Under Nevada law, the owner of water rights owns neither the land nor the water; the right is usufructuary only. Desert Irrigation, Ltd. v. State, 944 P.2d 835, 842 (Nev. 1997) (per curiam). Second, even if Defendants had an easement by necessity, the government retains the right to issue reasonable regulations—and it

12

has done so by requiring a grazing permit.  See McFarland, 545 F.3d at 1112

("Even where a statutory right of access exists, the [federal agency] has broad

discretion to regulate its use."); see also Diamond Bar, 168 F.3d at 1217

("Plaintiffs contend their water right is of little utility if their cattle have no place to

graze.  If true, the fault lies with plaintiffs, who were fully apprized of the

consequences of failing to renew their permits.").  See generally Adams v. United

States, 3 F.3d 1254, 1259 (9th Cir. 1993).  In sum, the district court's "easement by

necessity" theory plainly contravenes the law.

Defendants offer several alternative theories on appeal in support of

affirmance.  None is persuasive.

Collateral estoppel does not apply here against the government.  In 1991,

Hage Senior and his wife sued the government in the Federal Court of Claims.

Hage v. United States (Hage I), 35 Fed. Cl. 147, 153–56 (1996).  Although they

initially prevailed on some claims, the Federal Circuit reversed on all such claims

and remanded for further proceedings.  Hage VIII, 687 F.3d 1281.  On remand, the

trial court held that no further claims had merit and entered judgment for the

government.  Estate of Hage v. United States (Hage IX), 113 Fed. Cl. 277 (2013).

Because that judgment is in favor of the government, we need not decide whether

any subsidiary determinations in that case were adverse to the government.  Any

13

determinations adverse to the government would not have any preclusive effect here. See, e.g., United States v. Weems, 49 F.3d 528, 532 (9th Cir. 1995) ("[A] determination adverse to the prevailing party is not given preclusive effect.").

Defendants' water rights do not include, as a matter of state law, an implicit, appurtenant grazing right on federal lands. As recognized by federal and Nevada courts alike (including the district court here), the Taylor Grazing Act preempted any such right. Colvin Cattle Co. v. United States, 468 F.3d 803, 807–08 (Fed. Cir. 2006); Ansolabehere v. Laborde, 310 P.2d 842, 849–50 (Nev. 1957).

Defendants have not established a right of way pursuant to Revised Statute (R.S.) 2477, which is the title given to section 8 of the Mining Act of 1866: "the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." 14 Stat. at 253.[3] Defendants have not shown that any roads exist, let alone that Nevada established the alleged roads as public "highways" under Nevada law. See Lyon v. Gila River Indian Cmty., 626 F.3d 1059, 1077 (9th Cir. 2010) (holding that the party asserting an R.S. 2477 right of way has the "burden to establish [its] existence" and that "the first question is whether [the State] at some point established these roads as public highways under

---

[3] The FLPMA repealed this section at the same time that it repealed the "ditches and canals" right of way. As noted above, in footnote 1, that 1976 repeal did not affect existing rights of way. 43 U.S.C. § 1769(a).

14

[state] law"); see also S. Utah Wilderness All. v. BLM, 425 F.3d 735, 773–74 (10th Cir. 2005) ("At the opposite extreme [from a recognized 'highway'], in Cassity v. Castagno, 347 P.2d 834, 835 (Utah 1959), the Utah Supreme Court declined to recognize an R.S. 2477 right of way where one cattleman had a practice of herding his cattle across the lands of another to get to and from winter grazing land.").

Finally, the district court correctly rejected the argument—for legal and factual reasons that Defendants have not challenged on appeal—that certain treaties between the United States and the original owners of the land are relevant.

In sum, Defendants' unauthorized grazing of cattle on federal lands was unlawful, and their water rights have no effect on the analysis.

B.    Defendants' Counterclaim

Defendants' counterclaim under the APA is barred by the statute of limitations. "To obtain judicial review under the APA, [a party] must challenge a final agency action." Or. Nat. Desert Ass'n v. U.S. Forest Serv., 465 F.3d 977, 982 (9th Cir. 2006). The six-year statute of limitations found in 28 U.S.C. § 2401(a) applies to APA claims. Wind River Mining Corp. v. United States, 946 F.2d 710, 713 (9th Cir. 1991). Defendants filed the counterclaim in 2011.

The BLM's denial of an application for a grazing permit in 1993 plainly cannot provide the foundation for an APA claim, because it occurred 18 years before Defendants filed the counterclaim—12 years after the statute of limitations expired.

The district court held, instead, that "[t]he United States . . . has taken 'final agency action' by filing the present lawsuit."  But we have long held that "litigation decisions are generally committed to agency discretion by law, and are not subject to judicial review under the APA."  City of Oakland v. Lynch, 798 F.3d 1159, 1165 (9th Cir. 2015) (alteration omitted) (quoting Didrickson v. U.S. Dep't of Interior, 982 F.2d 1332, 1339 (9th Cir. 1992)); see 5 U.S.C. § 701(a)(2) (providing that the APA does not apply to the extent that "agency action is committed to agency discretion by law").  Accordingly, the Attorney General's discretionary decision to file this lawsuit cannot give rise to an action under the APA.[4]

---

[4] Even if the Attorney General's decision to file this lawsuit were a final agency action, the "agency" would be the Department of Justice, not the Forest Service or the BLM.  Other than the filing of this lawsuit and defending the Estate's suit in the Court of Federal Claims, the Department of Justice has not taken any actions relevant to grazing permits or water rights.  For that reason, too, the claim would fail.

16

There is no support for the district court's conclusion that the filing of this action could give rise to an APA claim. The district court cited only one case in support: AT&T Co. v. EEOC, 270 F.3d 973, 975 (D.C. Cir. 2001). That case stands for the opposite conclusion. The district court misleadingly quoted only a portion of the relevant passage of that opinion:

> Under the circumstances of this case, there clearly would be final agency action if the Commission filed a lawsuit against AT&T. (Of course, the Company could not challenge that decision as final agency action under the APA; it would instead simply defend itself against the suit.)

Id. The district court quoted the first sentence but ignored the very next phrase: "Of course, the Company could not challenge that decision as final agency action under the APA[.]" Id. (emphasis added).

Nor does the "continuing violations" doctrine—urged by Defendants on appeal—save this claim from the time bar. At the outset, we note that the doctrine almost certainly does not apply to APA claims. See Preminger v. Sec'y of Veterans Affairs, 517 F.3d 1299, 1307 (Fed. Cir. 2008) (holding that the doctrine does not apply to APA claims). But even assuming that the doctrine could apply to an APA claim, it does not apply here because Defendants cannot show that any agency action occurred within the limitations period. See Cowell v. Palmer Township, 263 F.3d 286, 292 (3d Cir. 2001) (holding that, under the continuing

17

violation doctrine as applied in the § 1983 context, "an action is timely <u>so long as the last act evidencing the continuing practice falls within the limitations period</u>" (emphasis added) (internal quotation marks omitted)). The doctrine clearly is aimed at the scope of the remedy: "the court will grant relief for the earlier related acts that would otherwise be time barred." <u>Id.</u> (internal quotation marks omitted). The doctrine does not allow a claim that is <u>entirely</u> time barred. As the Seventh Circuit has put it, "[t]he continuing violation doctrine allows a plaintiff to get relief for a time-barred act by linking it with an act that is within the limitations period." <u>Doe v. R.R. Donnelley & Sons Co.</u>, 42 F.3d 439, 445 (7th Cir. 1994) (internal quotation marks omitted).

The statute of limitations bars Defendants' counterclaim.

C. <u>Instructions on Remand</u>

We reverse in part, vacate in part, and remand with instructions. We reverse the judgment for Defendants on their counterclaims and remand with instructions that the district court enter judgment for the government. No further proceedings on the counterclaims are necessary.

We vacate the judgment with respect to the government's trespass claims and remand for reconsideration under the correct legal standard. Because the government does not challenge the district court's factual findings concerning

when cattle under Defendants' control grazed on federal lands, further evidentiary proceedings likely are not needed. The district court shall enter judgment for the government on all claims supported by the record, shall calculate appropriate damages, and shall enter appropriate injunctive relief. We encourage the parties and the court to bring this litigation—unnecessarily protracted by the district court—to a speedy and just resolution.

On remand, the district court shall determine, among other things, whether the source of law—state law or federal law—has any effect on the calculation of damages. Because of the positions taken by the government in this case, the answer appears to be "no." During closing argument at trial, the government's lawyer expressly disclaimed exemplary (punitive) damages and stated that the government "is only seeking compensatory damages." It appears that, under state law, the appropriate measure of compensatory damages is "all loss actually sustained as a direct result of the trespass." Gerlach Live Stock Co. v. Laxalt, 284 P. 310, 311 (Nev. 1930). It is unclear to us how that measure differs from the federal-law measure of damages that the government sought in its post-trial brief:

"the reasonable value of the occupancy and use, considering its extent and duration, and not the scale of charges named in the regulations."[5]

Our final consideration is the government's request that we remand the case to a different district judge. "We reassign only in rare and extraordinary circumstances, such as when the district court has exhibited personal bias or when reassignment is advisable to maintain the appearance of justice." Nat'l Council of La Raza v. Cegavske, 800 F.3d 1032, 1045 (9th Cir. 2015) (citations and internal quotation marks omitted). We regretfully conclude that the quoted standard is met here because "a reasonable observer could conclude that the judge's feelings against [the federal agencies] are both well-established and inappropriately strong." Id. at 1046.

Defendants openly trespassed on federal lands. Rather than simply resolving the fact-specific inquiries as to when and where the cattle grazed illegally, the district court applied an "easement by necessity" theory that plainly contravenes the law. The district court also encouraged Defendants to file a counterclaim that was clearly time barred. The only support that the court cited to overcome the obvious jurisdictional problem was a decision that stands for the opposite

---

[5] We express no view as to whether federal law would permit a different measure of damages in a different case.

20

conclusion. Moreover, as discussed more fully in a separate disposition filed today, the court grossly abused the power of contempt by holding two federal agency officials in contempt of court for taking ordinary, lawful actions that had no effect whatsoever on this case. See Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 831 (1994) ("[T]he contempt power . . . uniquely is liable to abuse. . . . Contumacy often strikes at the most vulnerable and human qualities of a judge's temperament, and its fusion of legislative, executive, and judicial powers summons forth the prospect of the most tyrannical licentiousness." (citation, internal quotation marks, and ellipsis omitted)).

A dispassionate observer would conclude that the district judge harbored animus toward the federal agencies. Unfortunately, the judge's bias and prejudgment are a matter of public record. On the first day of the 21-day trial, the judge stated: "the Bureau of Land Management, you come in with the standard arrogant, arbitrary, capricious attitude that I recognize in many of these cases." "[I]t's my experience that the Forest Service and the BLM is very arbitrary and capricious." "Your insistence upon a trespass violation, unwillful —your arbitrary determination of unwillfulness [sic: willfulness] is undoubtedly going to fail in this court."

21

At a pretrial motions hearing, the judge advised a third-party rancher that he could file a lawsuit against the government and that "[h]opefully you'll get Judge Jones because I'm very receptive to Mr. Hage's lawsuit." Addressing Hage, the judge stated: "You have a court that's very receptive and sympathetic to your claim."

At a separate pretrial motions hearing, the judge stated: "In my opinion, not only in this case but in many cases, the government has been all too ready to—in the name of revoking or suspending or limiting grazing licenses, the government has been all too ready in the history of Nevada to impair otherwise suspected and substantiated rights of landowners." The judge explained in detail:

> We all know what that game is about. . . . And the game, just for the record, even though the government in many cases didn't have the right to insist upon a permit, because asking for a permit would be an additional limitation on the right of use of a property right[], nevertheless, the government in many cases has insisted upon it, and then, when they denied or suspended or revoked the right, they said you no longer have the right. So that's what that game is all about.

During the contempt hearings, the judge stated: "I don't like and never have liked the BLM's or Forest Service's arrogant presumption that they could assess to people for [animal unit months], for trespass, their own travel costs, office costs, sitting in their big chair already paid for by the American taxpayer." Compare 43 C.F.R. § 4150.3 (providing that the amount due for willful unauthorized grazing

22

includes "all reasonable expenses incurred by the United States in detecting, investigating, [and] resolving violations"). The judge's statements in this case reflect both pre-judgment of the merits and bias against the federal agencies.

Judge Jones' improper treatment of government officials and his improper statements about federal agencies were the subject of United States v. United States District Court (In re United States), 791 F.3d 945 (9th Cir. 2015). See La Raza, 800 F.3d at 1046 (looking to the conduct and statements of the district judge in other cases, when deciding whether to remand for reassignment). In that case, Judge Jones had refused to admit out-of-state Assistant United States Attorneys to practice before the court under a personal policy that such admissions were not warranted unless the local Assistant United States Attorneys were unavailable. In re United States, 791 F.3d at 949–50. After the government filed a mandamus action, Judge Jones reversed his decision in that particular case but continued to apply the policy in at least one other case. Id. We held that district courts have discretion to deny admission, but that Judge Jones "clear[ly]" had acted outside that discretion. Id. at 955. The following is the passage most relevant to this case:

> [S]ome of Judge Jones's comments risked giving the impression that his admission policy was motivated by his disagreement with the enforcement priorities of specific federal agencies. For instance, during a proceeding in [a different case], Judge Jones stated:

23

My experience has been, in a number of cases, that when I admit out-of-state licensed attorneys for the U.S. Government, that they feel no obligation to me under the ethical standards of the Nevada Bar . . . . <u>And some of the directions taken by the Internal Revenue Service and attorneys out of and licensed out of Washington with respect to that is just abhorrent to me</u>.

(emphasis added). Similarly, an order denying a motion for reconsideration in [a second case] stated: "[t]he local United States Attorney, Mr. Daniel G. Bogden, serves under an Attorney General who, <u>under the guise of prosecutorial discretion, selectively enforces laws to further political objectives that ought to be left to the legislature</u>. There is simply no presumption that his subordinates are above ethical reproach." (emphasis added). . . . [C]omments like these created a real risk that the policy would, rightly or wrongly, be viewed as an encroachment on the domain of the political branches.

Id. at 958. We held that, in an appropriate case, mandamus is a viable remedy. Id. at 960. We also noted that "Judge Jones's practice . . . may itself qualify as the type of conduct properly addressed by the Judicial Council." Id. at 959; see also id. at 964 (Wallace, J., concurring in the judgment) ("Judge Jones's pattern of denying admission and then reversing himself only after the government files a petition for a writ . . . likely qualifies . . . as the type of conduct that is most properly addressed by the Circuit Council.").

We also have expressed concern about Judge Jones' conduct in several other recent cases. See La Raza, 800 F.3d at 1046 (remanding to a different district judge because a reasonable observer could conclude that his "feelings against out-

of-state attorneys are both well-established and inappropriately strong" and noting that this court had earlier found his comments "troubling" in Henry A. v. Willden, 678 F.3d 991, 1012 (9th Cir. 2012)); Benvin v. U.S. Dist. Court (In re Benvin), 791 F.3d 1096, 1104 (9th Cir. 2015) (per curiam) ("Here, the appearance of justice will best be served by reassignment to a different judge.  The current district judge [Judge Jones] has already expressed explicit views on the appropriate terms of the parties' plea agreement, suggested the terms he would and would not accept, and explained that he would not grant any motion dismissing forty-nine counts of the indictment unless the government complies with such terms."); Townley v. Miller, 693 F.3d 1041, 1043–45 (9th Cir. 2012) (order) (Reinhardt, J., concurring) (stating that Judge Jones' actions "can only be explained as a deliberate attempt to evade review by higher courts" and that "[s]uch arrogance and assumption of power by one individual is not acceptable in our judicial system").  On remand, we instruct the Chief Judge of the District of Nevada to assign the case to a different district judge.

**REVERSED in part, VACATED in part, and REMANDED with instructions.**  Costs on appeal are awarded to Plaintiff-Appellant.

# COUNSEL

Elizabeth Ann Peterson (argued), William B. Lazarus, David C. Shilton, Stephen G. Bartell, Anna K. Stimmel, Bruce K. Trauben, and Vivian H.W. Wang, Attorneys, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; John C. Cruden, Assistant Attorney General, Robert G. Dreher, Acting Assistant Attorney General, Daniel B. Bogden, United States Attorney, Elizabeth White, Appellate Chief, and Blaine T. Welsh, Assistant United States Attorney, District of Nevada, United States Department of Justice, Las Vegas, Nevada; and Nancy C. Zahedi, Regional Solicitor's Office, United States Department of the Interior, Sacramento, California, and Kenneth D. Paur, Assistant Regional Attorney, Office of General Counsel, United States Department of Agriculture, Denver, Colorado, for Plaintiff-Appellant.

Mark L. Pollot (argued), Boise, Idaho, and John W. Hoffman, Hoffman, Test, Guinan & Collier, Reno, Nevada, for Defendant-Appellee Estate of E. Wayne Hage; and Wayne H. Hage, Tonopah, Nevada, pro se, as and for Defendant-Appellee.

John Echeverria and Hillary M. Hoffmann, Vermont Law School, South Royalton, Vermont, for Amici Curiae Natural Resources Defense Council, Inc., and Sierra Club.

Brian T. Hodges, Pacific Legal Foundation, Bellevue, Washington, as and for Amicus Curiae.